[Crim. No. 14405.   Second Dist., Div. Five.   Jan. 22, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. IRA LEE KING, JR., Defendant and Appellant.

Ira Lee King, Jr., in pro. per., and Gilbert F. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Suzanne E. Graber, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J. — The defendant, Ira Lee King, Jr., was found guilty by a jury of robbery of the first degree (Pen. Code, §§ 211, 211a) as charged in count II of the information and of kidnaping for purposes of robbery (Pen. Code, § 209) as charged in count III of the information.[1] His motion for a new trial and request for probation were denied. Sentenced to the state prison on the two counts,[2] he filed a *pro se* notice of appeal[3] from the judgment of conviction. Pursuant to his request, this court appointed appellate counsel for him.

■ The sole issue which counsel raises in this appeal is whether it was error to permit the reading at the trial of the testimony of the robbery victim given at the preliminary hearing, the victim then being confined to a hospital due to a cerebral thrombosis, incapacitated from speaking, and unable to be transported to the court to testify. Furthermore, the prognosis was that the witness would not recover his speech facility for another eight-week period. We have concluded that there was no error and that the judgment should be affirmed.[4]

Upon his direct examination at the preliminary hearing, Lee E. Freeman had testified in substance as follows:

---

[1]Defendant was also charged with another robbery (Pen. Code, § 211) in count I of the three-count information, but a mistrial was declared on this count. Subsequently, this count was dismissed.

[2]The trial court further ordered: "Sentence on count 3 stayed pending any appeal and pending satisfaction of judgment in [*sic*] count 2. Said stay to become permanent upon completion of appeal period and satisfaction of judgment on count 2." *Quaere* whether the stay of execution was placed on the lesser penalty on the two crimes arising out of one transaction, if the purpose of the stay was compliance with Pen. Code, § 654. (See Pen. Code, §§ 212, subd. 1, 209, 3046 and 3049.)

[3]It states that defendant "appeals from the judgment of conviction rendered against him on August 17, 1967 and from the judgment and sentence pronounced on September 14, 1967." The record discloses no judgment rendered against defendant on August 17, 1967; only the verdicts finding him guilty on counts II and III were returned and entered. The verdicts themselves are not appealable (see e.g. *People* v. *Gotham* (1960) 185 Cal.App.2d 47 [8 Cal.Rptr. 20]; *People* v. *Goldstein* (1955) 136 Cal.App.2d 778, 793 [289 P.2d 581]), so we disregard this portion of the notice of appeal as surplusage.

[4]Points raised by defendant in his *pro se* brief are considered later.

During the early evening hours of December 20, 1966, he was the manager of the Buster Car Company used car lot located on South Figueroa Street in Los Angeles. At that time a man approached him on the lot, ''brought from behind a Luger-type automatic,'' and told him to keep his hands and head down and walk to the office. Freeman complied.

Inside the office, the gunman said, ''I want all your money'' and ''where is the safe?'' Freeman answered that they had no safe and that the only money he had was on his person in his pockets. The gunman then said, ''Give it to me.'' Freeman testified, ''I took the money I had in my left trousers pocket. I handed it to him. He took it in his hand and tossed it over on the desk.''

The gunman thereupon stated that he wanted ''all of it,'' so Freeman took a money folder out of his hip pocket, which the gunman took and put into his pocket.

The monies taken from Freeman's two pockets totalled about $240.

The gunman next proceeded to search through the desk drawers, which he had commanded Freeman to open. After looking through the drawers, the gunman closed them, one by one, using the barrel of his pistol to do so.

In the meantime, another man came in from the outside, took the money which the gunman had obtained earlier from Freeman and had thrown on the desk, and went outside again.

Freeman opened the drawers of another desk on the other side of the office, as commanded. From the center drawer of this desk, the gunman took and put into his own pocket ''a $30 money order, a $15 money order, and a $6.50 personal, and a $5 personal check,'' all drawn payable to the Buster Car Company.

Freeman was then commanded ''to turn around and lay down on the floor.'' When Freeman hesitated ''a little too long,'' the gunman hit Freeman on the head, knocking off Freeman's glasses, and causing Freeman to bleed. The gunman attempted to hit Freeman again. Freeman warded off the blow, and in the ensuing ruckus the gunman's weapon fell to the floor. In this scuffle, Freeman suffered two gashes to his scalp, one requiring five surgical stitches and the other two stitches.

After the gunman ''dropped his gun, he did not make any effort to retrieve the gun. He took off and ran out the door.'' Freeman then got his own gun and went after the culprit, who ''went down'' with the first shot Freeman fired. Not-

withstanding that, Freeman "kept firing."[5] Freeman returned to his office and telephoned the police. The gun, which had been dropped by the hold-up man, was still lying on the floor after the police arrived and when Freeman left in an ambulance for the emergency hospital.

Freeman identified the defendant, Ira Lee King, Jr., as the gunman and the Luger-type automatic produced at the hearing as appearing "to be the identical" gun as used in the robbery.

Freeman was then cross-examined by defendant's counsel at the preliminary hearing as follows:

"Q. Is the car lot that you were originally stopped on well-lit?

"A. Yes, it is.

"Q. Would you say that it would give approximately the same light as a streetlight?

"A. Even more so.

"Q. Did you, when you were in the car lot, have an opportunity to face the individual that approached you?

"A. Yes, I did.

"Q. Approximately how far from this individual were you?

"A. About an arm's length.

"Q. Did this individual have a beard?

"A. Just a mustache.

"Q. What was he wearing?

"A. He had on a red baseball cap and a knit sweater. I believe it was a pastel. I can't remember the exact color of it.

"Q. You indicate that some money was removed, the sum of $240 in currency, is that correct?

"A. That is correct, yes.

"Q. How much of that was on your person?

"A. All of it.

"Q. $240 was in your pocket?

"A. Yes. That is right.

"Q. You indicated that you were hit on the head?

"A. Yes. That is correct.

"Q. Did you make any fast movements prior to that?

"A. No.

"Q. You were just standing there?

"A. Just standing there.

"Q. Were you going into any desk drawers?

---

[5]It was stipulated at the trial that Freeman "fired his gun and he emptied the gun, which contained eight bullets."

"A. No."

The circumstantial evidence produced at the trial likewise pointed to defendant's guilt. The defendant was arrested about 9:20 p.m. in the hallway of an apartment two or three doors east of the used car lot. He did not live in the apartment. He was found shot in the lower back and upper buttocks region and bleeding profusely. He was wearing a knitted type shirt or sweater, but no shoes. The sum of $196, plus some change, was found in his right front pocket. A wallet was removed from his rear pants pocket, containing a driver's license showing his home address to be elsewhere. "Numerous" checks and money orders made payable to the Buster Car Company, and a re-order form for personalized checks with "Freeman" on it, were found in the wastebasket of a room in the apartment, where defendant was first seen immediately preceding his arrest in the hallway. At the receiving hospital, a police officer observed some teeth of a comb removed from the area of the bullet wound suffered by the defendant.

The police, responding to a radio call right after the robbery, found the following items at the Buster Car Company: (1) a .45 automatic weapon on the office table, (2) a loaded P-38 German automatic weapon on the floor underneath the table, and (3) a red baseball cap on the floor under a desk drawer. Outside the office, they also recovered some spent .45 caliber shells, a pair of shoes, and a black comb.

Essentially, the defense consisted of the testimony of several witnesses, which given full credence would amount to no more than a qualified alibi defense, and defendant's own testimony.

Defendant admitted being on the premises at the time of the robbery, but claimed that he had gone there for the purpose of trading his car and making a down-payment. He had $180 to $190 on him for the purposes of making the down-payment. When he arrived at the used car lot and had reached the top of the porch, another man bumped into him and a gun fell to the ground. At that moment, he was shot in the back and fell. He saw a second man with a gun and determined that the shot had come from that direction. He tried to pick up the gun lying on the ground and to fire it. It would not operate, so he threw it on the porch. He then made his way to an apartment house "mostly" by "sliding." He admitted that the comb and shoes found at the Buster Car

Company premises were his, but denied ownership of the baseball cap.

The identification testimony of the absent witness Freeman that it was the defendant who held the gun on him and relieved him of his money and who took the money orders and checks from his immediate presence was, therefore, an essential part of the prosecution's case.

The issue of nonavailability presents no serious question here.[6] The evidence thereon was undisputed. It was stipulated that if a Dr. Akira Nishizawa were called and sworn as a witness, he would testify: that he is a doctor of medicine licensed to practice in California, specializing in internal medicine; that he examined the witness, Lee Freeman, Sr., on August 13, 1967, about 1 p.m., at the Washington Hospital in Los Angeles; that he diagnosed Freeman to be suffering most likely from a cerebral thrombosis with possibilities of subdural hematoma; that the patient was confused and unable to speak, which condition would not clear up for another eight weeks; and that the patient could not be moved to the court at that time to testify. The investigating officer, Rollie Lawson, also testified at the trial on August 15, 1967, that he had seen Freeman at the Washington Hospital about 1:30 p.m. of the previous day (August 14, 1967), and at which time Freeman was unable to speak at all.

The preliminary hearing was conducted on February 17, 1967. The trial proceedings were held on August 11, 14, 15, 16, and 17, of 1967. The provisions of the Evidence Code are, therefore, applicable. (Evid. Code, § 12.)

Before the effective date of the Evidence Code (January 1 1967), prior recorded testimony of an absent witness could be read to a jury in a criminal trial only where the witness was dead, insane, or could not with due diligence be found within the state. (Former Pen. Code, § 686; *People* v. *Lint* (1960) 182 Cal.App.2d 402, 420-421 [6 Cal.Rptr. 95]; *People* v. *Rinesmith* (1940) 40 Cal.App.2d 786, 790 [105 P.2d 1021].) Section 240, subdivision (a)(3), of the Evidence Code now provides that a witness is unavailable if he is "[d]ead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity."

---

[6] In *People* v. *Nieto* (1968) 268 Cal.App.2d 231 [73 Cal.Rptr. 844] it was held that failure to exercise diligence in subpoenaing a witness, who was in the state before trial but who subsequently left the state and was outside the state at time of trial, prevents the witness from being legally unavailable so as to permit use of his preliminary hearing testimony.

Section 686 of the Penal Code was amended to read, commencing from the effective date of the Evidence Code, in part as follows:

"In a criminal action the defendant is entitled: . . . 3. . . . to be confronted with the witnesses against him, in the presence of the court, except that: (a) Hearsay evidence[7] may be admitted to the extent that it is otherwise admissible in a criminal action under the law of this state. (b) The deposition of a witness taken in the action may be read to the extent that it is otherwise admissible under the law of this state."

Section 1291 of the Evidence Code provides in part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." This provision was intended by the Legislature to apply to criminal as well as civil cases.[8]

In this case, defendant's counsel at the preliminary hearing did exercise the defendant's right and opportunity of cross-examining the witness Freeman. He astutely focused his questions on the identification testimony of Freeman given on direct examination. While it is true that "[a] preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial" (*Barber* v. *Page* (1968) 390 U.S. 719, 725 [20 L.Ed.2d 255, 260, 88 S.Ct. 1318 1322]), nevertheless the interest and motive for the cross-examination of a prosecution witness in both proceedings are similar. Defense counsel is also on notice at the pre-

[7]Evid. Code, § 1200: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. (b) Except as provided by law, hearsay evidence is inadmissible. (c) This section shall be known and may be cited as the hearsay rule."

[8]The legislative committee comment reads in part: "Section 1291 will also permit a broader range of hearsay to be introduced against the defendant in a criminal action than has been permitted under Penal Code Section 686. Under that section, former testimony has been admissible against the defendant in a criminal action only if the former testimony was given in the same action—at the preliminary examination, in a deposition, or in a prior trial of the action." (Assembly Journal, April 6, 1965.)

liminary hearing that the reporter's transcript of that hearing can be used against the defendant at the trial if the witness then testifying becomes unavailable. In permitting the transcript of the absent witness Freeman to be read at the trial, the trial court found the interest and motive of the cross-examination of Freeman at the preliminary hearing to be similar to that which the defense counsel would have had if Freeman had testified at the trial. (Evid. Code, § 402 subd. (c).) The statute requires only that the interest and motive be similar, not identical. We find no abuse of discretion or error in the trial court's finding in this regard.

The defendant filed a supplemental appellant's brief, albeit with permission first obtained. Differing from *In re Cathey* (1961) 55 Cal.2d 679, 684-685 [12 Cal.Rptr. 762, 361 P.2d 426], where the *pro se* briefs were filed before appointment of appellate counsel, this supplemental brief was filed subsequently to his counsel's filing his very workmanlike brief raising the dispositive issue presented by the record on appeal. ▮ As a general rule, a defendant who is represented by counsel upon appeal may not file *pro se* documents and such documents may properly be stricken (*People* v. *Mattson* (1959) 51 Cal.2d 777, 798 [336 P.2d 937]) or disregarded (*People* v. *Root* (1966) 246 Cal.App.2d 600, 604, fn. 2 [55 Cal.Rptr. 89]). However, since permission to file the *pro se* brief was obtained in this case, we have given consideration to each of the points raised therein. We do not, however, find any of them as having any merit. We further add that the fact that permission was granted the defendant to file a *pro se* supplemental brief in this case and that we have taken the time to consider it should not be construed as precedent for future cases of this kind.

The judgment is affirmed.

Stephens, Acting P. J., and Reppy, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 19, 1969.