[Crim. No. 43941. Second Dist., Div. Four. Jan. 10, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
L. C. McCOY, Defendant and Appellant.

COUNSEL

David E. Brockway for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Howard J. Schwab and William H. Davis, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KINGSLEY, J.**—Defendant was charged with: (count I) assault with a deadly weapon on Michael Everett, in violation of Penal Code section 245, subdivision (a);[1] (count II) attempted murder of Louise Everett, in violation of sections 664/187; and (count III) assault with a deadly weapon on Louise Everett, in violation of section 245, subdivision (a). Injury and firearm-use allegations were made as to each count (§§ 12022.5, 12022.7.) Defendant pled not guilty and not guilty by reason of insanity. After trial by jury, he was found guilty on all counts, and the special allegations were found true. The jury found the attempted murder to be first degree. In subsequent proceedings, the jury found that defendant was sane at the time of the crimes. He was sentenced to state prison.

On this appeal from the judgment of conviction, defendant claims reversible error in that the jury was inadequately instructed on self-defense, alcohol-related diminished capacity, unconsciousness, and "unreasonable" self-defense. We find error only in the diminished capacity instructions, but find that defendant cannot have been prejudiced thereby, as the defense of diminished capacity was unavailable to him as a matter of law. Accordingly, we affirm.

Defendant and Louise Everett had lived together for several years. They separated in the spring of 1981, when Louise went to live with her adult son Michael. During the separation, defendant and Louise spoke daily on the telephone and saw each other often. Defendant was upset over the separation, thought that Louise's children were at fault, and wanted to get back together with her.

---

[1] All statutory references are to the Penal Code.

On the night of February 7, 1982, after arguing with Louise on the telephone, defendant drove to Michael's house, a distance of 50 miles. He arrived after midnight. Michael refused to let him in, but defendant insisted upon seeing Louise. Defendant forced his way in, hit Michael with a gun he had brought and began to scuffle with Michael on the floor. Threatening to kill Michael, defendant shot him in the neck at point-blank range. He then stood up, pointed the gun at Louise, who had come down the stairs, and fired at her two or three times. One of the bullets grazed her body.

Defendant testified that at the time of the shootings he was drinking about a fifth of hard liquor daily. After having a few drinks on the night of February 7, he lost track of time for several hours. He did, however, remember the telephone argument and most of the ensuing events. When Michael refused to let him in to see Louise, defendant put his foot in the door. Michael then hit him and the two men began to wrestle inside the house. At some point a gun appeared in Michael's hand. It went off at least twice while appellant was trying to disarm him. The gun belonged to defendant, but defendant had not brought it with him. He did not know how it came to be in Michael's possession.

A court-appointed psychiatrist testified that defendant's distrust of Louise and her children amounted to a paranoid psychosis; this, in combination with his alcoholism, rendered him incapable of harboring malice.

I

Defendant did not request jury instructions on the law of self-defense, and none were given. He now argues that the court was obliged to give such instructions on its own motion. We disagree.

"[T]he duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 336 [185 Cal.Rptr. 436, 650 P.2d 311].)

Defendant's theory was, and is, that the shootings were accidental rather than volitional. His testimony at trial was that he neither fired the

gun intentionally nor ever gained possession of it.[2] In his brief on appeal, he characterizes the defense evidence as showing that "the gun accidentally went off." This theory is inconsistent with self-defense, as self-defense implies an intentional shooting. (*People* v. *Mayweather* (1968) 259 Cal.App.2d 752, 756 [66 Cal.Rptr. 547].) *Absent request,* defendant was therefore entitled to self-defense instructions only "if it appear[ed] that [he was] relying on such a defense." (*Sedeno, supra,* 10 Cal.3d at p. 716; *People* v. *Wickersham, supra,* 32 Cal.3d at p. 329.)

In *Wickersham,* as here, the defendant countered evidence of a deliberate intentional shooting by testimony that the gun fired accidentally in the course of a struggle. The court held that such testimony made it clear that the defendant was not relying on the theory of unreasonable self-defense (cf., *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]) and that such a theory was inconsistent with the proffered defense of accident. Thus, the court held, "the trial court was under no obligation to instruct an unreasonable self-defense in the absence of a specific request by counsel." (32 Cal.3d at p. 329.) By parity of reasoning, the court here was under no obligation to instruct on self-defense absent counsel's request.

We note that the verdicts rendered in this case, particularly that finding premeditation and deliberation, indicated the jury's disbelief of defendant's version of events. No quantity of instructions on self-defense could have made his testimony more credible, hence it is highly unlikely that self-defense instructions would have changed the result. Thus, although defendant might have been entitled on request to have the jury consider whether his testimony—*if* believed—established self-defense, he is not entitled in justice to obtain a reversal by relying only now on a theory that in all probability would have been unavailing had he offered it for consideration below.

## II

Several instructions were given on intoxication and diminished capacity. The jury was told, per CALJIC No. 4.20, that voluntary intoxication was not a defense to the assaults charged in counts I and III. As to count II, the

---

[2]Defendant described two firings. As to the first, he testified: ". . . I looked and saw a gun in [Michael's] hand, and I grabbed the gun. And we started wrestling for the gun back towards the back of the house. The gun went off." On cross-examination he stated that his hand was not on the trigger when the gun went off.

As to the second firing, he testified: "Later we tussled . . . . We wrestled for the gun. I was trying to turn the gun out of his hand. . . . The gun moved again, and was pointed right at my eye. I happened to move my head back in this manner (indicating), and I vaguely heard the gun go off again." On cross-examination he stated that at no point during this struggle did he succeed in gaining possession of the gun.

jury was told, per CALJIC No. 4.21, that if such intoxication prevented defendant from forming the specific intent to commit murder, he could not be found guilty of attempted murder. In addition, the court delivered CALJIC 8.77, which essentially stated two principles: First, that defendant could not be convicted of attempted murder or attempted voluntary manslaughter if, by reason of intoxication or mental defect, he failed to form, or lacked the capacity to form, the intent to kill; and second, that he could not be convicted of *first degree* attempted murder, if, by reason of intoxication or mental defect, he did not maturely and meaningfully reflect upon the gravity of his contemplated act.[3] Finally, the jury was instructed, per CALJIC No. 3.36, that the psychiatric evidence of defendant's mental disorder could be considered solely for the purpose of determining whether he had actually formed the mental state requisite to attempted murder.

The crime of attempted voluntary manslaughter was not defined for the jury. At one point in the instructions, it was named as a lesser included offense of attempted murder. At another point, the jury was told (incorrectly) that count II charged defendant with attempted murder *and* attempted voluntary manslaughter.

We agree that this set of instructions was conflicting and confusing to some extent, although not to the extent that defendant claims in his brief. However, as we shall explain, defendant was not prejudiced thereby.

■ First, the first paragraph of CALJIC No. 4.20 should have been omitted. That paragraph states: "Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.'" Had *only* the assaults been charged, this instruction would have been proper in its entirety. But since voluntary intoxication *does* make the specific-intent crime of attempted murder "less criminal" if it prevents formation of the intent to kill, CALJIC No. 4.20 is inapplicable to the charge of attempted murder. The problem with the first paragraph of the instruction as delivered in this case, is that, unlike the second paragraph, it was not tailored to exclusively address the assault charges. The instruction therefore tended to erroneously imply that the evidence of intoxication could not be considered in assessing defendant's guilt of attempted murder.

We think that this implication was adequately countered by other more specific instructions, however. As stated above, both CALJIC Nos. 4.21

---

[3]In other instructions the jury was told that a verdict of first degree attempted murder could be returned only upon the finding of a premeditated and deliberate intent to kill. (CALJIC Nos. 8.11, 8.20.)

and 8.77 specifically stated that intoxication *was* relevant to defendant's guilt of attempted murder insofar as it may have prevented him from forming (or having the capacity to form) the intent to kill, and insofar as it may have prevented him from maturely and meaningfully premeditating such intent. Under these circumstances, we do not find it probable that the jury was misled.

■ Secondly, it was error to deliver CALJIC No. 8.77. Since the defense of diminished capacity was abolished by the Legislature prior to the commission of the crimes (see Pen. Code, § 28), that defense—as set forth in CALJIC No. 8.77—was unavailable to defendant. The law applicable to defendant's crimes was accurately stated not in CALJIC No. 8.77, but in No. 3.36. The latter instruction, as noted above, advised the jury that the evidence of mental disorder was relevant only to the question whether the mental states requisite to attempted murder had *in fact* been formed. CALJIC No. 3.36 was of course inconsistent with CALJIC No. 8.77 insofar as the latter instruction addressed the *capacity* to form, as opposed to the *actual* formation of, the specific intent to kill. However, to the extent that the "capacity" language of CALJIC No. 8.77 conveyed any meaning to the jury, defendant's chances for acquittal of attempted murder can only have been aided thereby.

Third, the conflicting references to attempted voluntary manslaughter were undoubtedly confusing, particularly as voluntary manslaughter was never defined. We cannot accept defendant's claim, however, that the CALJIC No. 8.41 definition of voluntary manslaughter (suitably adapted to the *attempted* crime) should have been given. Although it is true that CALJIC No. 8.41 is a necessary companion-instruction of No. 8.77, both instructions address only the type of voluntary manslaughter which is proven by the diminished capacity defense, and hence both are inapplicable to all offenses committed after the effective date of Penal Code section 28's abolition of that defense.

Taking the instructions as a whole, and disregarding those instructions that were likely to have been rejected as inconsistent with others, we think the jury was advised as follows: defendant could be convicted of attempted murder only if he in fact intended to kill Louise Everett; intoxication and mental disorder could be considered as "defenses" to attempted murder only insofar as they prevented the formation of specific intent; even if defendant intended to kill, his crime could be fixed in the first degree only if he in fact premeditated and deliberated that intent. If, due to intoxication or mental disorder, he did not actually form the intent to kill, his crime was only assault with a deadly weapon, since no specific intent need be shown to prove assault.

Since, under these instructions, the jury did find attempted murder and fixed that crime as first degree, it necessarily found that defendant *did* form the intent to kill[4] and did premeditate that intent. These findings show that the jury rejected the possibility that intoxication or paranoia prevented the formation of the deliberate intent to kill. Hence, to the extent that appellant was entitled to forward the defenses of intoxication and mental disorder in count II, these defenses were forwarded, considered, and rejected. Accordingly, the errors do not justify reversal.

### III

■ Citing *People* v. *Flannel, supra,* 25 Cal.3d 668, and *People* v. *Heffington* (1973) 32 Cal.App.3d 1 [107 Cal.Rptr. 859], defendant contends that the court's failure to define manslaughter precluded the jury from finding attempted voluntary manslaughter in count II. This contention fails, because defendant was not entitled to *sua sponte* instruction on the *Flannel* theory of manslaughter, and because he was not entitled, even on request, to instruction on the *Heffington* (i.e., diminished capacity) theory of manslaughter.

In *Flannel,* our Supreme Court recognized that an honest but unreasonable belief in the necessity to use deadly force to defend oneself negates the existence of malice aforethought and reduces murder to voluntary manslaughter. This theory of "unreasonable self-defense" can also serve to reduce the crime of attempted murder to attempted voluntary manslaughter. Had defendant requested manslaughter instructions on such a theory, the court would have been obliged to deliver them. However, no such instructions were requested, and as we noted above (see pt. I, *ante*), the proffered defense of accident was inconsistent with the theory of unreasonable self-defense. Under these circumstances, the court was not obligated to instruct on this theory of manslaughter on its own motion. (*People* v. *Wickersham, supra,* 32 Cal.3d 307, 329.)

■ Nor was the court obliged to instruct, per *Heffington,* that the negation of malice due to diminished capacity reduces attempted murder to attempted voluntary manslaughter. Defendant would have been entitled to such an instruction had his crime occurred before January 1, 1982, the date that the abolition of the diminished capacity defense went into effect. (See

---

[4]Defendant also appears to suggest that the jury should have been instructed, *sua sponte,* that if he lacked the intent to kill due to *unconsciousness,* his crime was attempted *involuntary* manslaughter. We find this suggestion untenable both on the evidence, which was inconsistent with unconsciousness, and with the law, which does not recognize such a crime. At any rate, there can be no prejudice since the jury did find intent to kill.

Pen. Code, § 28.) Since the crime occurred afterward, the court was not required—and it would have been error—to so instruct.

We also note that, in the absence of a request, defendant was not entitled to instruction on attempted voluntary manslaughter on the only remaining theory of that crime—the negation of malice aforethought due to a sudden quarrel or heat of passion. This form of voluntary manslaughter, like all others, requires an intent to kill, and hence was inconsistent with defendant's testimony that the shots were unintentional.

In short, we wholly reject defendant's claim that attempted manslaughter was a viable option for the jury on the record of this case. Defendant chose to go to the jury with two alternate theories. One was that any shots that occurred were the accidental result of a struggle over the gun; the other appeared to be that, even if the shots were fired by his hand, they were still nonvolitional in the sense that intoxication and psychosis prevented him from knowing what he was doing or intending to do what he did. Neither of these theories showed attempted voluntary manslaughter; rather, if believed, they compelled the finding that defendant's crime, if any, was assault with a deadly weapon. As noted in section II, *supra,* the jury was adequately instructed to this effect.

The judgment is affirmed.

Woods, P. J., and McClosky, J., concurred.

A petition for a rehearing was denied January 31, 1984.