[No. D001358. Fourth Dist., Div. One. May 22, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
HASAN OGEN, Defendant and Appellant.

612

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WORK, Acting P. J.**—Hasan Ogen appeals a judgment convicting him of murder (Pen. Code,[1] § 187) and finding he personally used a firearm (§ 12022.5). Ogen argues the murder victim's preliminary hearing testi-

---

[1]All statutory references are to the Penal Code unless otherwise specified.

mony, given against him during prosecution for an earlier assault and rape, should not be excepted from the hearsay rule; and the jury was misinstructed on the concurrence of act and intent in first degree murder and on voluntary manslaughter, and improperly received no instruction on a diminished mental capacity defense. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Ogen began a tumultuous relationship with the victim in 1979 in San Francisco. They lived together until the victim moved to San Diego in February 1980. Ogen visited periodically and called frequently. In July 1981, the victim attempted to end her relationship with Ogen. He continued to vow his love for her and became more agitated and disturbed as his affection went unrequited.

On December 5, 1981, Ogen, in disguise, confronted the victim in the parking lot of her workplace. He forced her into the car, choked her, threatened her with a handgun, and rebuked her for seeing other men. He told her she had made his life miserable and he would kill her and then himself. They then drove for a considerable time, eventually returning to the victim's home where he raped her.

Ogen was arrested and charged with kidnaping (§ 207), assault with a deadly weapon (§ 245), and rape (§ 261). In the interim, he had continued to make threatening phone calls to the victim, and made at least one such call from jail. Preliminary examination was held January 8, 1982, and the victim testified to Ogen's numerous physical assaults and repeated threats he would kill her if she continued to reject him, including references to threats and actual kidnapings at gunpoint. Ogen extensively cross-examined her on each point. Ogen was released on bail the following day. He was admonished not to contact the victim, and this admonishment was repeated at his arraignment and several bail hearings. Ignoring these warnings, Ogen again accosted the victim and shot her in the head. He then shot himself in the face.

Ogen pleaded not guilty by reason of insanity and claimed the shooting was accidental, occurring when the gun the victim held fired when he tried to take it from her. He stated he feared no one would believe his story and decided to shoot himself.

Ogen was found guilty of first degree murder while sane.

## THE VICTIM'S FORMER TESTIMONY WAS PROPERLY EXCEPTED FROM THE HEARSAY RULE

The trial court admitted the victim's preliminary examination testimony from the prior kidnap-rape proceeding, ruling it was relevant to Ogen's

intent and motive for the killing. (Evid. Code, § 1101, subd. (b).[2]) Ogen does not deny its relevancy, but argues the former testimony is inadmissible hearsay because his inability to meaningfully cross-examine the dead victim denied him confrontation rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and article I, section 15 of the California Constitution.

■ The right to confrontation primarily secures the defendant's right to complete and adequate cross-examination. (*Pointer* v. *Texas* (1965) 380 U.S. 400, 405-407 [13 L.Ed.2d 923, 927-928, 85 S.Ct. 1065]; *People* v. *Brock* (1985) 38 Cal.3d 180, 189 [211 Cal.Rptr. 122, 695 P.2d 209].) However, "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. [Citation.] This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purpose behind the confrontation requirement. [Citations.]" (*Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318].) ■ In California, this exception is codified in Evidence Code section 1291, subdivision (a)(2): "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

■ Ogen's challenge turns on the question: Was cross-examination at the preliminary hearing in a different proceeding against the same defendant undertaken with an *interest and motive similar to that which he had at trial?*

Ogen avers the significant difference between the defense he intended to present to the rape charge and that offered to the murder showed his intent and motivations were significantly different in the two proceedings. Ogen claims he intended to prove consent to the kidnap and rape charges; while at the trial, he claimed diminished mental capacity at the time of the homicide. On these facts, we find Ogen's distinction a difference without consequence to his right of confrontation.

---

[2]Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

 Evidence Code section 1291, subdivision (a)(2) requires only that the defendant's interest and motive in cross-examination at separate proceedings be similar, not identical. (*People* v. *King* (1969) 269 Cal.App.2d 40, 48 [74 Cal.Rptr. 679].) However, "[t]here is no magic test to determine similarity in interest and motive to cross-examine declarant. Factors to be considered are matters such as the similarity of the party's position in the two cases, the purpose sought to be accomplished in the cross-examination, and whether under the circumstances a thorough cross-examination of declarant by the party would have been reasonably expected in the former proceeding." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1982) § 8.2, p. 292.) Accordingly, courts have upheld admitting an unavailable witness' preliminary hearing testimony at trial in the same case, even though the respective proceedings involve markedly different standards of proof. (*People* v. *Sul* (1981) 122 Cal.App.3d 355, 368-369 [175 Cal.Rptr. 893]; *People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 572-573 [156 Cal.Rptr. 630]; *People* v. *Johnson* (1974) 39 Cal.App.3d 749, 755 [114 Cal.Rptr. 545].)

 Here, however, the preliminary hearing testimony is from a different proceeding. Nonetheless, in both actions, Ogen's interest and motive in cross-examination is similar. In both, the victim's testimony was adverse to Ogen's claim of innocence. Regardless of the specific defense involved, his primary motive was to undermine the victim's credibility and to exploit weaknesses in her testimony bearing on his culpability. The 68 transcript pages of cross-examination reveal close, methodical and penetrating questioning of the victim's characterization of Ogen's dogged pursuit of her and his histrionic displays of anger and hostility. Further, Ogen's assertion of error is speculative. Defense counsel presented no expert testimony on Ogen's diminished capacity, nor argued the defense to the jury, nor requested instruction on it. In *People* v. *Williams* (1968) 265 Cal.App.2d 888, 897 [71 Cal.Rptr. 773], the Court of Appeal held merely asserting a change of strategy in a later proceeding was an insufficient basis to reject the hearsay exception effected by Evidence Code section 1291, subdivision (a)(2). Moreover, both the victim's direct and cross-examination testimony at the preliminary hearing was *wholly consistent* with a diminished capacity defense had it been presented. In sum, we find Ogen had a meaningful opportunity to completely and adequately cross-examine the victim in a prior proceeding. So finding, we hold the former testimony was properly admitted and Ogen was not denied his right to confrontation under the United States or California Constitutions. (*California* v. *Green* (1970) 399 U.S. 149, 165-166 [26 L.Ed.2d 489, 501, 90 S.Ct. 1930]; *Pointer* v. *Texas, supra,* 380 U.S. 400, 407 [13 L.Ed.2d 923, 928, 85 S.Ct. 1065]; *People* v. *Brock, supra,* 38 Cal.3d 180, 188-190.)

## ■ The Jury Was Properly Instructed on the Necessary Concurrence of Act and Requisite Mental State for First Degree Murder

After considerable argument, the trial court used CALJIC Nos. 3.31 (1980 rev.) and 3.31.5 to instruct an act and a particular mental state must concur in a crime. CALJIC No. 3.31[3] identified specific intent as the requisite mental state for voluntary manslaughter, while No. 3.31.5 stated murder required proof of malice aforethought. Ogen alleges the giving of these instructions in the above order prejudicially misled the jury to infer "first degree murder unlike voluntary manslaughter does not require the concurrence of act and the specific intent to kill."

While instructions may be prejudicially misleading (see, e.g., *People* v. *Martinez* (1980) 105 Cal.App.3d 938, 943 [165 Cal.Rptr. 11]) or confusing (see, e.g., *People* v. *Collie* (1981) 30 Cal.3d 43, 61 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]), such is not the case here. ■ In determining misinstruction, "the jury instructions must be read together and understood in context as presented to the jury. Whether a jury has been correctly instructed depends upon the entire charge of the court. [Citations.]" (*In re Martin* (1983) 150 Cal.App.3d 148, 158 [197 Cal.Rptr. 655]; accord *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 46 [121 Cal.Rptr. 269].) Moreover, " '[t]he sequence in which instructions are given is a matter in the sound discretion of the trial court, and a very strong showing of prejudice must be made before a reviewing court will hold its discretion abused.' " (*People* v. *Carrasco* (1981) 118 Cal.App.3d 936, 942 [173 Cal.Rptr. 688], quoting *Nungaray* v. *Pleasant Valley etc. Assn.* (1956) 142 Cal.App.2d 653, 661-662 [300 P.2d 285].)

■ Here, immediately after giving CALJIC No. 3.31.5, the court defined homicide (CALJIC No. 8.00), murder (CALJIC No. 8.10 (1979 rev.)), and malice aforethought (CALJIC No. 8.11 (1982 rev.)). CALJIC No. 8.11 specifically states: "Malice is express when there is manifested an intention unlawfully to kill a human being." The court next instructed on first degree murder and stated: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing, with express malice aforethought, is murder of the first degree." (CALJIC No. 8.20 (1979 rev.).) CALJIC No. 8.20 has specifically been held to properly instruct on

---

[3]CALJIC No. 3.31 states: "In the lesser included offense of the crime charged in [Count One *of*] the information, [namely,] Voluntary Manslaughter, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator and unless such specific intent exists the crime to which it relates is not committed.

"[The crime of Voluntary Manslaughter requires the specific intent to kill a human being.]"

the elements of first degree murder. (*People* v. *Kozel* (1982) 133 Cal.App.3d 507, 522 [184 Cal.Rptr. 208]; *People* v. *Benjamin* (1975) 52 Cal.App.3d 63, 84-85 [124 Cal.Rptr. 799].) Indeed, the giving of CALJIC No. 8.20, even in the absence of Nos. 3.31 and 3.31.5, would have resulted in proper instruction on first degree murder. (*People* v. *Benjamin, supra,* at pp. 84-85.)

The challenged instructions here were contiguous and covered less than four typewritten pages. We find these instructions properly sequenced, clear, and well within the ken of the ordinary juror.

### A *Sua Sponte* Instruction on Diminished Capacity Was Not Warranted

Ogen next contends the trial court erred in failing to instruct *sua sponte* on the effect of diminished mental capacity on the ability to actually form an intent to kill.[4]

The law is clear: " '[T]he duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311], quoting *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) Ogen's arguments fall short of invoking the trial court's duty under this rule. From the outset, defense counsel stated he lacked evidence to support a diminished capacity defense. In a colloquy apparently undertaken to minimize voir dire regarding Ogen's insanity plea, defense counsel stated: "Of the four living psychiatrists who have examined the defendant, none have come up with a conclusion that he was insane at the time of the . . . offense, and none have come up with the conclusion that there was diminished capacity. So, I feel I have no viable expert testimony on either issue." Defense counsel also stated he lacked lay testimony for a diminished capacity defense. Further, while evidence explicated Ogen's volatile and sometimes tempestuous na-

---

[4]Section 28, subdivision (a), effective at the time of trial, precludes "[e]vidence of mental disease, mental defect, or mental disorder . . . to show or negate the capacity to form any mental state, including but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." However, such evidence is admissible solely to determine whether the accused actually formed the required specific intent.

ture, no substantial evidence supported a diminished capacity instruction. Appellate counsel points to Ogen's alleged suicidal threats and attempted suicide as prima facie evidence of a mental defect. However, this same evidence was available to the examining psychiatrists who apparently found it far less credible or compelling than appellate counsel. Most importantly, Ogen himself denied threatening suicide and stated he formulated the thought to shoot himself *only* after the victim was shot. In sum, absent a request, Ogen was not entitled to instruction on a diminished capacity defense. (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 392; *People* v. *McCoy* (1984) 150 Cal.App.3d 705, 708-709 [198 Cal.Rptr. 94].)

## The Voluntary Manslaughter Instructions Were Complete and Correct

Ogen lastly argues the instruction on voluntary manslaughter was misleading and incomplete.

The trial court employed CALJIC Nos. 8.40[5] (1979 rev.) and 8.42[6] (1979 rev.) to instruct on voluntary manslaughter and mitigating provocation, re-

---

[5]CALJIC No. 8.40 provides: "The crime of voluntary manslaughter is the unlawful killing of a human being without malice aforethought when there is an intent to kill.

"There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion.

"In order to prove the commission of the crime of voluntary manslaughter, each of the following elements must be proved:

"1. That a human being was killed,

"2. That the killing was unlawful, and

"3. That the killing was done with the intent to kill."

[6]CALJIC No. 8.42 provides: "To reduce an intentional felonious homicide from the offense of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such character and degree as naturally would excite and arouse such passion, and the assailant must act under the smart of that sudden quarrel or heat of passion.

"The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable man faced with the same situation. The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.

"If there was provocation, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful killing of a human being followed such provocation and had all the elements of murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

spectively. These standard instructions thoroughly and correctly outline the essential elements of what is sometimes called statutory voluntary manslaughter. (*People* v. *Castillo* (1969) 70 Cal.2d 264, 270 [74 Cal.Rptr. 385, 449 P.2d 449]; *People* v. *Pacheco* (1981) 116 Cal.App.3d 617, 625 [172 Cal.Rptr. 269]; see § 192, subd. (a).) This Ogen concedes. He urges, however, the instruction on voluntary manslaughter did not reach "nonstatutory voluntary manslaughter," and was therefore erroneous.

Nonstatutory voluntary manslaughter "was developed to give effect to the statutory definition by recognizing the later development of the doctrine of diminished capacity which may render a person incapable of harboring malice." (*People* v. *Small* (1970) 7 Cal.App.3d 347, 355, fn. 3 [86 Cal.Rptr. 478].) The roots of this concept are grounded in cases recognizing *any* extreme emotional state as negating the formation of malice. (*People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]; *People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97]; *People* v. *Spurlin* (1984) 156 Cal.App.3d 119, 125 [202 Cal.Rptr. 663].)

Ogen cites *People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911] which states: "[A] finding of provocation sufficient to reduce murder to manslaughter is not the sole means by which malice can be negated and voluntary manslaughter established. A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect or intoxication, and in such case his killing, unless justified or excused, is voluntary manslaughter. [Citations.]" He interprets this language as suggesting he should be deemed to have acted without malice if he killed the victim while acting under heat of passion, even though the provoking act is of so little consequence that it would not impair an ordinarily reasonable person's ability to form malice.

An historical exposition of the meaning and application of the terms "upon a sudden quarrel or heat of passion" as used to describe voluntary manslaughter (§ 192) is contained in *People* v. *Valentine* (1946) 28 Cal.2d 121, 138-144 [169 P.2d 1]. The requirement that a provocation must be sufficient to excite the passions of a reasonable person to kill, was taken from the common law and first enacted in this state in the Crimes and Punishment Act of 1850 (§ 23). Later, it was enacted in section 192 in 1872 in the manner in which it still appears. A code section is presumed to be a continuation of common law only when it and the common law are substantially the same. (*People* v. *Valentine, supra,* 28 Cal.2d 121, 142.) Although the discussion in *Valentine* emphasizes the common law as enacted in the

Crimes and Punishment Act of 1850 is substantially different in certain respects from that contained in section 192, it is substantially the same on the point in question. The Legislature is deemed to have understood the terms as used by the common law and as construed continuously by our Supreme Court throughout the years, to allow a defendant to reduce a killing from murder to manslaughter only in those situations where the provocation would trigger a homicidal reaction in a reasonable person. Because we construe section 192 as legislatively expressing a reasonable person test, we must uphold it unless it is shown to be constitutionally infirm.

Ogen analogizes to the holding in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1], for the principle that unreasonable conduct may negate a particular mental state. He contends even if he reacts with unreasonable sensitivity to minimal provocation which would not trigger homicidal reactions in reasonable persons, he should not be found guilty of murder if, in fact, his reaction is so severe it impairs his capacity to form malice. He equates this principle to that expressed in *Flannel,* that one who acts with an honest but unreasonable belief he must kill in self-defense, acts without malice. However, there are significant differences between the principle recognized in *Flannel* and that with which we are concerned here. First, the Supreme Court did not change the existing law by its holding in *Flannel,* it merely stated what had always been the law in this state, although seldom recognized and rarely applied. On the contrary, Ogen asks us to overturn well settled, well recognized and routinely applied case law relating to the defense of heat of passion.

Second, there are substantial policy reasons to restrict the application of the heat of passion defense to cases where the circumstances are sufficiently provocative to trigger violent reactions in a reasonable person. As members of society, each of us is constantly in contact with family members, friends, acquaintances and strangers under countless circumstances. No social interaction is so placid as to be utterly devoid of interpersonal stress and friction including, we speculate, monastic existence short of becoming a hermit. Ogen's suggested rule would limit homicides to manslaughter upon any fancied slight so long as the perpetrator was sufficiently sensitive. Ethnic, racial, or religious slurs, and sexual innuendos trigger violent reactions and occasionally killings. However, society has a strong interest in deterring violent and homicidal conduct by not allowing individuals to justify their acts by their own standard of conduct. As stated in *People* v. *Valentine, supra,* 28 Cal.2d 121, 139, "[t]hus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate, nor could an excessively cowardly man justify himself unless the circumstances were such as to arouse the fears of the ordinarily courageous man."

Judgment affirmed.

Lewis, J., and Adams, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 14, 1985.

---

*Assigned by the Chairperson of the Judicial Council.