Aubrey HENDRIX, et al.,
Plaintiffs-Appellees,

v.

RAYBESTOS–MANHATTAN, INC., et al., Defendants-Appellants.

No. 82–8548.

United States Court of Appeals,
Eleventh Circuit.

Nov. 26, 1985.

Michael V. Elsberry, Atlanta, Ga., for defendants-appellants.

Albert H. Parnell, Frank C. Bedinger, III, H. Lane Young & Sally D. Hauptfuhrer, Atlanta, Ga., for Johns-Manville Prod. Corp.

Richard K. Hines, Edgar A. Neely, Jr., Atlanta, Ga., For Raybestos-Manhattan.

Thomas H. Hart, III, Ronald L. Motley, Charles W. Patrick, Jr., Charleston, S.C., Jerry Phillips, Knoxville, Tenn., for plaintiffs-appellees.

Before TJOFLAT and HATCHETT, Circuit Judges, and GARZA *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Manville Corporation [1] and Raymark Industries, Inc. [2] appeal from money judgments entered in these diversity cases [3] pursuant to jury verdicts in favor of four workers in the insulation industry who contracted asbestosis, a progressive and incurable lung disease, as a result of handling appellants' asbestos insulation products. The jury found appellants liable to these workers on the theory that appellants had negligently failed to warn them that they could contract asbestosis if they failed to wear a respirator to prevent inhalation of the asbestos dust ordinarily generated by the routine handling of asbestos insulation products.

Appellants seek a new trial on several grounds. They do not question the sufficiency of the evidence to make out a case of negligent failure to warn or allege that the instructions under which this theory of liability was submitted to the jury were erroneous; [4] accordingly, this opinion will not address these issues. The only error the appellants assert that requires reversal is the district court's submission of the appellees' claims for future medical expenses to the jury. To remedy this error, we order remittiturs. The judgments are otherwise affirmed.

I.

Appellants' threshold position in this appeal is that, in consolidating these cases for trial, the district court prevented appellants from receiving a fair trial. The gist of their argument is that the four cases were

---

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Manville Corporation is the parent of a family of subsidiary corporations, including Johns-Manville Corporation. We will refer to it as "Johns-Manville" throughout this opinion.

2. Raymark Industries, Inc. was formerly known as Raybestos-Manhattan, Inc. We will refer to it as "Raymark" throughout this opinion.

3. The district court's jurisdiction over these cases was conferred by 28 U.S.C. § 1332(a)(1) (1982).

4. Appellees' negligent failure to warn claim, and the elements thereof, is discussed in Part II., *infra.*

so factually dissimilar on the issues of liability and damages that a fair trial was impossible. Accordingly, we should set aside all four judgments and remand the cases for separate trials.

We begin our assessment of appellants' argument by consulting Fed.R.Civ.P. 42(a), and the cases applying it, which circumscribe a district court's authority to consolidate civil actions for trial. Rule 42(a) provides:

(a) **Consolidation.** When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

This rule is a codification of a trial court's inherent managerial power " 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.' " *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012 (5th Cir.1977) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936)).[5] We have encouraged trial judges to "make good use of Rule 42(a) ... in order to expedite the trial and eliminate unnecessary repetition and confusion." *Dupont v. Southern Pacific Co.*, 366 F.2d 193, 195 (5th Cir.1966), *cert. denied*, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 106 (1967).

██ A district court's decision under Rule 42(a) is purely discretionary. *In re Air Crash*, 549 F.2d at 1013; *Whiteman v. Pitrie*, 220 F.2d 914, 917–18 (5th Cir.1955). In exercising its discretion, the court must determine:

[W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir.1982), *cert. denied*, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983) and 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). The court must also bear in mind the extent to which the risks of prejudice and confusion that might attend a consolidated trial can be alleviated by utilizing cautionary instructions to the jury during the trial and controlling the manner in which the plaintiffs' claims (including the defenses thereto) are submitted to the jury for deliberation. We will not disturb a trial court's decision to consolidate unless it constitutes a clear abuse of discretion. *In re Air Crash*, 549 F.2d at 1013; *Whiteman*, 220 F.2d at 918.

When the district court consolidated these actions for trial, it had pending before it forty-four asbestosis cases. Each case had been brought by an individual (and, perhaps, his or her spouse) claiming to have contracted asbestosis as a result of inhaling asbestos dust on the job site. Some of these individuals had been exposed to the dust while engaged in the manufacture of asbestos-containing products; some, like the appellees, had been exposed while handling such products. Johns-Manville and Raymark were but two of several manufacturers of asbestos products sued in these cases.

██ The court consolidated appellees' cases, over appellants' objection, because appellees were similarly situated in terms of the manner in which they had been exposed to asbestos and the extent of their disease.[6] All of the appellees, two of

---

5. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

6. The court ordered the consolidation of these cases for trial at a pretrial conference held two months prior to trial. The court consolidated the cases because, as we note in the text, appellees' exposure to asbestos and the extent of their disease were similar and the liability theories of their claims were identical.

whom are brothers, were insulators and had worked out of the same union hall in Savannah, Georgia, frequently on the same jobs. Their exposure to asbestos-containing insulation products had occurred during the same time frame. Each suffered from asbestosis and was being treated by the same physician. Moreover, their medical prognoses were nearly identical.

In deciding to consolidate appellees' claims for trial, the court rejected appellants' argument that the similarities of the claims were superficial and that the differences in appellees' exposure to asbestos dust would make it difficult for the jury to consider each claim on its own merits. To ensure that each claim would receive separate consideration, the court announced that it would adopt the following procedure at trial; each juror would be given a notebook, tabbed for each plaintiff and each defendant, and during the presentation of evidence the jurors would be given time, as necessary, to make notes.

In our view, the court's pretrial ruling to consolidate these cases was entirely reasonable. The four cases presented common issues of law and fact, and the factors we have referred to, *supra*, which inform a court's decision whether to consolidate, were duly considered. The striking similarity of these cases became even more apparent at trial, thus demonstrating the wisdom of the trial court's decision.

Appellee Aubrey Hendrix, age fifty-five, grew up on his parents' farm in south Georgia and quit school at the age of thirteen to help on the farm. He began working as an insulator in 1954 and was active in the trade, obtaining his job assignments from the local union hall, until 1963 when he took up farming. In 1970, he resumed work as an insulator until his retirement in 1980. Hendrix is nearly illiterate. He testified that, prior to 1979, when x-rays of his lungs disclosed asbestosis, he had no knowledge that asbestos dust presented a health hazard. His overall medical prognosis is bleak. In addition to suffering from asbestosis, Hendrix has high blood pressure, enlargement of the heart, high blood sugar, chronic bronchitis, and abnormal liver function. These other conditions have

been caused in part by obesity and by smoking a pack of cigarettes a day for thirty-five years.

Appellee Wainwright Hendrix, Aubrey's brother, was fifty-two years of age at the time of trial. He attended school through the ninth grade and can read and write. Wainwright Hendrix began working out of the Savannah union hall as an insulator in 1952. He worked numerous jobs in the south Georgia area, many with his brother and with the two other appellees. His only breaks from the trade, before retiring in 1981, occurred in 1960, when he was unable to find work for six months, and from 1971 to 1973. Wainwright Hendrix said he first learned of the dangerous propensities of asbestos dust in 1974 when he saw respirators at the job site. His health problems track those of his brother. Aside from asbestosis, he suffers from high blood pressure, angina, and emphysema. He also smoked cigarettes, the equivalent of fourteen "pack years," from 1951 until 1979.

Appellee Tyres D. Watson, sixty-three years of age, finished the eighth grade at age eighteen and is barely literate. After farming for five years in south Georgia, Watson got his first job as an insulator in 1946 and joined the union in 1949. He estimated that he worked between seventy-five and one hundred insulation jobs in his career. He retired from the trade in 1980. Watson testified that he had no knowledge of any health hazards associated with asbestos dust. Watson was a heavy smoker, having consumed the equivalent of forty "pack years" of cigarettes since the age of eighteen. In addition to a case of severe asbestosis, Watson suffers from asthma and chronic bronchitis.

Appellee William H. DeLoach, age fifty-one at trial, was the only one of the four appellees still employed as an insulator at the time of trial. DeLoach began working as an insulator in 1952 and joined the local union one year later. His only absence from the trade occurred from 1971 to 1974. He first learned of the health hazards associated with handling asbestos insulation in 1967 when the union began taking money out of his paycheck to support medical re-

search. Like Aubrey Hendrix, DeLoach smoked a pack of cigarettes a day for thirty-five years. DeLoach has a moderately advanced case of asbestosis, emphysema, and asthma.

The district judge took considerable care during the trial to minimize any confusion that might result from trying the four cases together. At one point, for example, he cautioned the parties to present their evidence slowly so the jurors could make adequate notes. On at least four different occasions he gave a cautionary instruction, reminding the jurors that, during their deliberations, they would have to consider each of the plaintiffs' claims separately. In sum, the cases here present precisely the kind of tort claims a court should consider consolidating for trial. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2384 (1971). A joint trial saved the appellants from wasteful relitigation, avoided duplication of judicial effort, and did not materially prejudice appellants' rights.

## II.

The appellees' negligent failure to warn claims contained five elements. First, the process of installing asbestos insulation of the type manufactured by appellants created asbestos dust; second, those engaged in the installation process, such as appellees, stood a good chance of contracting asbestosis unless they wore a respirator; third, appellants had actual or constructive knowledge (i.e., they knew or should have known in the exercise of ordinary care) of these facts and thus had a duty to warn the workers thereof; fourth, appellants either issued no such warning or their warning was inadequate under the circumstances; and fifth, as a proximate result of such conduct, appellees contracted asbestosis.[7] At trial, the appellant manufacturers conceded the first two elements and chose the third element as their primary battleground. Their second claim of error concerns the trial court's receipt, over their objection, of certain evidence appellees introduced to prove that element.

Since the outset of this litigation, appellees have contended that appellants knew by the 1930's that there was a substantial incidence of pulmonary asbestosis among asbestos miners,[8] manufacturing plant workers who extract asbestos fiber from asbestos rock,[9] and textile millworkers who weave the fiber into cloth,[10] and that appellants should have known that there was a similar incidence of asbestosis among installers of asbestos insulation.[11] Appel-

---

7. In Georgia, whose substantive law provided the rule of decision in these diversity cases, a manufacturer's duty to warn "may be breached in either of two ways: (1) failure to take adequate measures to communicate the warning to the ultimate user, or (2) failure to provide a warning that, if communicated, was adequate to apprise the user of the product's potential risks." *Rhodes v. Interstate Battery System of America, Inc.,* 722 F.2d 1517, 1519 (11th Cir.1984). *See generally Ford Motor Co. v. Stubblefield,* 171 Ga.App. 331, 319 S.E.2d 470, 476 (1984).

8. Asbestos originates, for the most part, in rock which has undergone an alteration resulting in a prismatic crystallization with a fibrous structure. Bowles, *Asbestos—General Information,* United States Department of the Interior, Bureau of Mines 4 (Information Circular 1935). Historically, miners have hammered the rock by hand to remove the crude asbestos fibers. Fulton, Dooley, Matthews & Houtz, *Asbestosis,* Department of Labor and Industry, Commonwealth of Pennsylvania, Bureau of Industrial Standards 5 (1936) [hereinafter cited as Fulton & Dooley, *Asbestosis* ].

9. At asbestos manufacturing plants, workers complete the removal of the asbestos fibers using several progressive processes. Fulton & Dooley, *Asbestosis,* at 5. The fibers are then prepared so that they may be spun into "yarn." Workers at manufacturing plants produce products such as asbestos paper, insulation, asbestos cement, shingles, lumber, and electrical fittings. *Id.* at 8.

10. Millworkers are essentially weavers who work at asbestos textile manufacturing plants. Weaving of asbestos "yarn" is done on looms in a manner similar to the method employed in weaving cotton, silk, or wool. Asbestos tape (for electrical insulation), cloth, and brake lining are woven. Fulton & Dooley, *Asbestosis,* at 8.

11. Insulators handle asbestos end-products, as distinguished from asbestos miners, manufacturing plant workers, and millworkers who handle raw forms of asbestos. Insulators use three types of asbestos products. The first is called pipe or boiler covering. Insulators beat, sand,

lants' response has been that, prior to 1964, the asbestos industry had no reason to believe that insulation installers were likely candidates for asbestosis. As a result of a medical study published in 1964, the industry learned that such installers ran a substantial risk of contracting asbestosis. The parties thus framed the question for the jury: When, if ever, did appellants know, or have reason to know, of the asbestosis risk to insulation installers prior to 1964?

To prove appellants' pre-1964 knowledge, appellees proffered the evidence now being challenged. This evidence included workmen's compensation claims prosecuted by mining and manufacturing employees of appellants who alleged that they contracted asbestosis from inhaling dust on the job site; personal injury suits brought by third parties who contended that they acquired the disease through exposure to asbestos dust; studies of industry workers that established a direct relationship between the amount of asbestos dust exposure and the frequency and extent of asbestosis; medical, scientific,[12] and trade literature addressing the asbestosis problem; and three letters from a collection of documents that has been referred to in asbestos cases as the "Sumner Simpson papers."[13]

Appellants objected to this evidence on two grounds. First, the evidence was alleged to be irrelevant because it did not explicitly address the issue of asbestosis among insulation installers, such as the appellees; second, if relevant, it should have been excluded because its "probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R. Evid. 403.[14] The district court overruled appellants' objection on both grounds and allowed the appellees to present this evidence to the jury. The court cautioned the jury, however, that the evidence was being received for the limited purpose of determining whether appellants had actual or constructive knowledge that asbestos insulation posed an unreasonable risk of harm to installers routinely handling the product.

■ We agree with the trial court that the challenged evidence was relevant to the issue of appellants' knowledge. First, as appellants concede, there was overwhelming evidence that mining and manufacturing plant workers in the asbestos industry had a far greater susceptibility to asbestosis than the general population and that appellants knew this. Second, the record permitted the inference that workers handling asbestos insulation products were equally susceptible to the disease and that appellants had actual or constructive knowledge of this fact. A recital of some of the evidence before the jury bears this out.

In 1929, appellants commissioned a research study into the relationship between asbestos and lung disease to determine the effects of asbestos fiber on textile mill workers. They did so because of the mounting evidence of a link between asbestos exposure and the lung disease that had come to be known as asbestosis. The re-

---

saw, cut, and wire the pipe and boiler covering insulation before applying it. The second is called asbestos cement or mud. Insulators mix the dry asbestos cement, which has the consistency of flour, with water and then apply the pasty cement to pipes and boilers. The third type of product is asbestos insulating cloth, which is woven and looks like a canvas cloth material.

**12.** Between 1910 and 1959, some 550 medical and scientific articles were published about asbestos-caused disease. Approximately 100 more articles were published between 1960 and 1965.

**13.** The "Sumner Simpson papers" consist of some 6,000 documents including correspondence, surveys, and memoranda, that date from the 1920's through the 1940's. The collection was compiled by Sumner Simpson, who, between 1929 and 1953, was president and later chairman of the board of Raymark. The papers were discovered in 1953 after his death.

**14.** Fed.R.Evid. 403 states:

**Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

sults of the study were published in 1935 by the United States Public Health Service [15] and indicated that prolonged exposure to asbestos dust caused a pulmonary fibrosis, asbestosis. The authors of the study recommended that the amount of asbestos dust in the air at asbestos processing plants be substantially reduced. Even before these results were published, officials of the appellant companies were aware of the hazards of asbestos dust exposure and were actively discussing the procedures the industry should follow to reduce dust levels at their facilities and to minimize potential liability to workers who became ill from breathing the dust. *See, e.g.*, Minutes of Meeting on Asbestos Dust Hazard in Manufacturing Operations, Johns-Manville Corp. (December 29, 1933); Letters between Vandiver Brown, general counsel of Johns-Manville Corp., and Sumner Simpson, president of Raymark (1935) (discussing publicity about British studies linking asbestos exposure to lung disease). A 1938 Public Health Service report concluded that the concentration of asbestos dust in the workplace should not exceed five million particles per cubic foot. This concentration became an industry standard that was followed until 1972, when the United States Department of Labor adopted and began enforcing a stricter standard of five asbestos particles per cubic centimeter.[16]

The first major epidemiological study of asbestos insulation workers was released in 1946. In that study, called the Fleischer-Drinker report,[17] three Navy medical officers and a member of the United States Maritime Commission examined approximately 1,000 insulation workers employed in shipyards along the eastern seaboard during the waning years of World War II. They found only three cases of asbestosis. The study concluded that asbestos covering of naval vessels was a relatively safe operation. Significantly, only five percent of the workers studied had been employed in the asbestos insulation trade for ten years or more. Because asbestosis usually cannot be diagnosed for ten to twenty years after initial exposure, the authors' conclusion was severely criticized and discounted. No other epidemiological studies on insulation workers were performed in the United States, however, until 1964, when the Selikoff study was conducted.

The authors of the Selikoff study contradicted the findings of the Fleischer-Drinker report, concluding that "asbestosis and its complications are significant hazards among insulation workers in the United States." [18] They had examined 1,522 members of an insulation workers' union in the New York metropolitan area and found that half of them had asbestosis. More-

---

**15.** The introduction to this study states:

In 1929 the Metropolitan Life Insurance Co. was approached by officials representing the asbestos industry in the United States, who were desirous of ascertaining whether asbestos dust was an occupational hazard in their establishments and, if so, what was the nature of this hazard and what should be done to prevent or control it.

About this time several articles had appeared in English medical journals describing a pneumoconiosis due to asbestos dust. While in one or two isolated instances the occurrence of this type of pneumoconiosis had been described in American journals, the industry itself appeared to be quite uninformed of the existence of any such occupational disease.

The hazard of silica dust, with special reference to the lungs, has long been appreciated, and a great deal of study and research has been applied to the problem (in the metal mining and certain other industries) in Great Britain, the United States, the British Dominions, and in other countries.

. . . .

The name "asbestosis" has been applied to the pneumoconiosis caused by asbestos dust. . . .

Lanza, McConnell & Fehnel, *Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers,* Pub.Health Rep., January 4, 1935, at 1.

**16.** In 1976, the Department of Labor further tightened this standard, reducing it to two particles per cubic centimeter.

**17.** Fleischer, Viles, Gade & Drinker, *A Health Survey of Pipe Covering Operations in Constructing Naval Vessels,* 28 J.Indus. Hygiene & Toxicology 9 (1946).

**18.** Selikoff, Churg & Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States,* 132 Annals N.Y.Acad.Sci. 139, 152 (1965).

over, of those who had more than forty years' experience in the insulation trade, over ninety percent had pulmonary abnormalities traceable to asbestos exposure. The authors of the Selikoff study opined that the results of the earlier Fleischer-Drinker study were misleading because ninety-five percent of the workers in that study had been exposed to asbestos-containing products for less than ten years. Johns-Manville responded immediately to the Selikoff study by placing warning labels on packages of its asbestos-containing insulation products. Raymark began this practice in 1972.

Appellees produced evidence tending to show that, long before the findings of the Selikoff study were published, appellants were put on notice that end-product users such as insulation workers were contracting pulmonary lung disease as a result of their exposure to asbestos-containing products. Since 1930, medical literature has cited cases of asbestosis among insulation workers. Appellees produced a medical historian who, using research guides to medical and scientific literature that have been available since the 1920's, produced a list of more than 500 articles published between 1899 and 1965 concerning asbestos-caused disease.[19] That list included approximately ninety relevant case studies, twenty epidemiological studies, some of which dealt with persons who had used asbestos end-products rather than being involved in asbestos mining and manufacturing, and nine medical textbooks. From this master list, the historian compiled a separate list of articles published prior to 1959 that mentioned the relationship between exposure to asbestos products and lung disease. The articles unearthed by the medical historian constituted only a portion of the information available to the asbestos

industry, and thus to appellants, demonstrating a link between asbestosis and exposure to asbestos-containing products such as insulation.

The three letters from the Sumner Simpson papers introduced into evidence strengthened the inference that appellants knew, or at least should have known, well before the Selikoff study was published that users of their asbestos-insulation products ran a substantial risk of contracting asbestosis. As described by the Fifth Circuit:

> The first letter, dated September 25, 1935, was written by A.F. Rossiter of *Asbestos* magazine to [Sumner] Simpson [then president of Raymark]. In this letter, Rossiter refers to previous requests made by Simpson that nothing be published in that magazine concerning the hazards posed by asbestos dust. In the second letter, dated October 1, 1935, Simpson states to Vandiver Brown, Johns-Manville's attorney, that "the less said about asbestos, the better off we are." Simpson in the same letter also refers to English articles on asbestos dust control and comments that *Asbestos* has "been very decent about not re-printing the English articles." Finally, in the third letter, dated two days later, Brown replies: "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity." He also suggests that, if they should decide eventually not to object to the publication of such an article, American instead of English data should be used on the theory that the asbestos dust was "considerably milder" in North America.

*Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1317–18 (5th Cir.1985) (en banc).[20]

---

**19.** *See supra* note 12. The medical historian's list did not include all of the articles that had been published between 1899 and 1965.

**20.** The complete text of the three letters reads as follows:

> "ASBESTOS"
> Published by
> SECRETARIAL SERVICE
> 16th Floor, Inquirer Bldg.
> Philadelphia, PA., U.S.A.
> September 25, 1935

Mr. Sumner Simpson, President,
Raybestos-Manhattan, Inc.,
Bridgeport, Conn.
Dear Sir:
    You may recall that we have written you on several occasions concerning the publishing of information, or discussion of, asbestosis and the work which has been, and is being done, to eliminate or at least reduce it.

The appellants' next argument is that, assuming that this body of evidence intended to show appellants' actual or constructive knowledge of the unreasonable risk of harm asbestos insulation presented to installers, that evidence, especially the Sumner Simpson letters, should have been excluded under Fed.R.Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice and confusion. We are not persuaded.

■ A trial judge's authority to exclude relevant evidence under Rule 403 is discretionary, which means that its exercise will not be disturbed on appeal absent a clear showing of an abuse of discretion. *United States v. Morano*, 697 F.2d 923, 926 (11th Cir.1983); *Stallworth v. Illinois Central Gulf Railroad*, 690 F.2d 858, 868–69 (11th Cir.1982). Rule 403 requires the judge to "balanc[e] the probative value of and the need for the evidence against the harm likely to result from its admission." Fed.

Always you have requested that for certain obvious reasons we publish nothing, and, naturally your wishes have been respected.

Possibly by this time, however, the reasons for your objection to publicity on this subject have been eliminated, and if so, we would like very much to review the whole matter in "ASBESTOS".

Our thought is that we could either prepare from data which we have in our files, or obtain from Mr. W.A. Godfrey of the Cape Asbestos Company, London, who is much interested in the subject, an article on the work done in England and then follow it with an article written by someone in your organization, as to the work done here.

We understand from Mr. Stover that your North Charleston plant, contains very complete dust control equipment and a description of such equipment, if you approve, would make a very interesting part of the article. Possibly even you could supply a photograph or two showing some part of this dust control equipment.

We await with much interest your reply. If there is no serious objection it would seem to be a most interesting subject for the pages of "ASBESTOS", and possibly a discussion of it in "ASBESTOS" along the right lines, would serve to combat some of the rather undesirable publicity given to it in current newspapers.

> Very truly yours,
> "ASBESTOS
> s/A.F. Rossiter
> A.F. Rossiter
> Bridgeport, Conn.
> Oct. 1, 1935

----------

Mr. Vandiver Brown, Attorney
Johns-Manville Corp.,
22 East 40th St.,
New York City.
My dear Mr. Brown:
Enclosed is copy of a letter received from Miss Rossiter, of "Asbestos."

As I see it personally, we would be just as well off to say nothing about it until our survey is complete. I think the less said about asbestos, the better off we are, but at the same time, we cannot lose track of the fact that there have been a number of articles on asbestos dust control and asbestosis in the British trade magazines. The magazine "Asbestos" is in business to publish articles affecting the trade and they have been very decent about not re-printing the English articles.

I shall be pleased to have your opinion in the matter.

> Very truly yours,
> President

SS–G
Enc.

----------

JOHNS–MANVILLE
Twenty-Two East Fortieth Street
New York, N.Y.

October 3, 1935

Mr. S. Simpson, President.
Raybestos-Manhattan, Inc.,
Bridgeport, Conn.
My dear Mr. Simpson:
I wish to acknowledge receipt of yours of October 1st enclosing copy of the September 25th letter from the editor of the magazine "ASBESTOS". I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity. Even if we should eventually decide to raise no objection to the publication of an article on asbestosis in the magazine in question, I think we should warn the editors to use American data on the subject rather than English. Dr. Lanza has frequently remarked, to me personally and in some of his papers, that the clinical picture presented in North American localities where there is an asbestos dust hazard is considerably milder than that reported in England and South Africa.

I believe the question raised by Miss Rossiter might well be considered at the committee meeting scheduled for next Tuesday, at which I understand both you and Mr. Judd will be present.

> Very truly yours,
> s/Vandiver Brown
> Vandiver Brown
> Attorney

VB:T

R.Evid. 403 advisory committee note. *See also Noel Shows, Inc. v. United States*, 721 F.2d 327, 329 (11th Cir.1983). Because the rule permits the exclusion of relevant evidence only when its probative value is substantially outweighed by the potential for undue harm, the rule favors admissibility of relevant evidence and should be invoked very sparingly to bar its admission. *Wilson v. Attaway*, 757 F.2d 1227, 1242 (11th Cir.1985); *Collins v. Seaboard Coast Line Railroad*, 675 F.2d 1185, 1189 (11th Cir. 1982). "Unfair prejudice" sufficient to warrant exclusion of relevant evidence must at a minimum have an "undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee note. *See also Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863 (5th Cir.1983).

As we have stated *supra,* appellants were put on notice in the early 1930's of the causal relationship between asbestos dust and asbestosis, as well as the fact that miners, plant workers, and handlers of asbestos insulation were highly susceptible to the disease. The inference to be drawn from the "Sumner Simpson" letters was that, insofar as appellants were concerned, the less publicity about asbestosis the better. Aside from suggesting that this evidence was "too remote," appellants do not explain how it was "unfairly" prejudicial. The evidence was not inflammatory and, in view of the court's cautionary instructions, there was little possibility that it confused the issues or misled the jury. Moreover, appellants had ample opportunity, in their closing arguments to the jury, to ensure that the evidence was placed in its proper perspective. *See Jackson v. Johns-Manville Sales Corp.*, 750 F.2d at 1319; Fed.R. Evid. 403 advisory committee note.

### III.

At trial, appellees introduced considerable evidence that suggested a causal relationship between an asbestos worker's exposure to asbestos dust and his chances of acquiring lung cancer. This evidence was presented through the testimony of five physicians who had published the statistical findings of various studies conducted among asbestosis victims. These findings, according to the physicians, indicated that exposure to asbestos results in "increased frequency and risk of lung cancer," that asbestos workers are in a "much higher risk group" to contract lung cancer, and that "well over fifty percent" of those with asbestosis die of lung cancer.

Appellees introduced this "cancer" evidence for two announced purposes: First, to establish a duty on appellants' part to warn those employed in the asbestos insulation trade that they stood a substantial risk of getting cancer if they did not wear a respirator while on the job; second, to show that appellees would probably suffer from lung cancer and should be compensated accordingly. Appellants contend that the cancer evidence tended to establish neither point and was therefore irrelevant. Moreover, appellants continue, this evidence had a highly prejudicial effect upon the jury, substantially tainting its verdicts. Appellants thus ask us to grant them a new trial as to each appellee.

Appellants' relevancy argument is persuasive. None of the appellees had cancer or established that he was reasonably certain to contract it in the future. Neither proved with reasonable certainty that he had incurred or would incur any medical expenses to monitor the cancer threat. The challenged evidence thus shed no light on the injury appellees had sustained or were likely to sustain as a result of appellants' alleged negligence.

■ As for the duty to warn issue, the evidence was, at best, only marginally relevant and was subject to challenge under Fed.R.Evid. 403 on the ground that its probative value was substantially outweighed by the danger of unfair prejudice. The evidence was only marginally relevant because by the time the relationship between asbestos dust and lung cancer became sufficiently known to trigger a duty to warn, the risk of asbestosis and the manufacturers' commensurate duty to warn had already been established and workers were being informed that failure to wear a respirator could lead to a debilitating, progres-

sive, incurable, and sometimes fatal disease of the lungs—asbestosis. It is highly questionable whether those workers who, like appellees, failed to appreciate the manufacturers' warnings about asbestosis, would have heeded their warnings if they had also been told that asbestos exposure could lead to lung cancer. We need not determine, however, whether the trial judge should have excluded the cancer evidence under Rule 403, because appellants failed to preserve the point by presenting a seasonable objection.

The only objection appellants made to the introduction of this evidence occurred prior to trial. At that time, they moved the court *in limine*, pursuant to Fed.R.Civ.P. 16(c)(3),[21] for a protective order excluding the evidence. Appellants asserted that appellees could not demonstrate a significant relationship between asbestos dust and lung cancer and that their sole purpose in introducing the evidence would be to inflame the jury. At a hearing on the motion, the court inquired of appellees' counsel as to what they expected their cancer evidence to prove. Counsel stated that their medical experts would opine that appellees, though not presently suffering from lung cancer, would acquire it in the future. The cancer evidence, therefore, would be a significant part of their proof on the issue of damages. Counsel also stated that the evidence would be probative of the third element of their negligent failure to warn claim, that appellants knew of the health hazards associated with the installation of asbestos insulation at the time appellees were being exposed to the asbestos products. Faced with these representations, the court denied appellants' motion for a protective order.

The court's ruling did not relieve appellants of the obligation to question the relevancy of the challenged evidence at trial if, for example, the medical experts could not say with the requisite reasonable medical certainty that appellees did or would have cancer or that they would incur medical expenses in the effort to avoid the disease. Nor did the court's ruling relieve appellants of the duty to make a Rule 403 objection if it appeared that the evidence, though relevant, contained the seeds of undue prejudice or would confuse or mislead the jury. When appellees' medical experts were unable to say that appellees had or would have cancer or even that they would incur medical expenses to guard against it, appellants should have objected. Inexplicably, they chose not to object. The only question before us, therefore, is whether the district court erred in denying appellants' pretrial motion *in limine*.

██ The decision whether to grant or deny appellants' pretrial motion was a discretionary one. In this instance, the court acted well within its discretion, reaching its decision after extensive argument of counsel. The court cannot be faulted for relying on the representations of appellees' counsel that they could prove, with reasonable medical certainty, that their clients would contract lung cancer. The parties had engaged in extensive discovery, and the court had no reason to believe, save appellants' conclusory assertions to the contrary, that appellees were misrepresenting the quality of the medical testimony they would present at trial. Litigation lawyers, as officers of the court, are obliged to make truthful representations of fact and law to the court. Model Code of Professional Responsibility DR 7–102(A)(5) (1980); *see also* Model Code of Professional Responsibility EC 7–25 (1980). As appellants correctly state, trial judges should hold attorneys to the statements they make in a pretrial conference. 6 C. Wright & A. Miller, Federal Practice and Procedure § 1527 (1971); *cf. United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598, 606 (5th Cir.1961); *Laird v. Air Carrier*

---

**21.** Fed.R.Civ.P. 16 provides in pertinent part:
   **Rule 16. Pretrial Conferences; Scheduling; Management**
      . . . .
      **(c) Subjects to be Discussed at Pretrial Conferences.** The participants at any confer-

ence under this rule may consider and take action with respect to
      . . . .
      (3) . . . advance rulings from the court on the admissibility of evidence. . . .

**1504**

*Engine Service, Inc.,* 263 F.2d 948, 953 (5th Cir.1959).

This, however, did not excuse appellants' failure to bring the matter to the court's attention if they wished the court to take some action. They certainly had ample opportunity to do so. At trial, when appellees' counsel began to question their medical experts about the relationship between asbestosis and lung cancer, appellants did not ask the court for leave to inquire of the witnesses, in the absence of the jury, as to whether they could prognosticate with reasonable medical certainty that any of the appellees had or would contract cancer. Rather, they simply stood by and allowed appellees' counsel to elicit testimony that the incidence of lung cancer is substantially greater in asbestosis victims than it is in the general population. Significantly, the medical experts offered no opinion as to appellees' chances of getting cancer. In fact, only one expert was even asked for such an opinion, and he stated that he could not give one. At the close of the direct examination of these experts, appellants did not move to strike their testimony as irrelevant, but simply proceeded with cross-examination.

Appellants had two subsequent opportunities to raise challenges to the admissibility of the cancer evidence. They could have moved the court, at the close of the plaintiffs' cases in chief, to strike the evidence from the record, and they could have requested the court, at the close of all the evidence, to instruct the jury to disregard the cancer evidence. Appellants bypassed both of these opportunities.

We have cautioned lawyers against blind reliance on a motion *in limine* to preserve the sort of objection appellants press here. The caution bears repeating:

> The overruling of a motion in limine is not reversible error; only a proper objection at trial can preserve error for appellate review.... Motions in limine are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial. When a party files numerous motions in limine, the trial court may not pay close

attention to each one, believing that many of them are purely hypothetical. Thus, a party whose motion in limine has been overruled must object when the error he sought to prevent with his motion is about to occur at trial. This will give the trial court an opportunity to reconsider the grounds of the motion in light of the actual—instead of hypothetical—circumstances at trial.

*Collins v. Wayne Corp.,* 621 F.2d 777, 784 (5th Cir.1980) (citation omitted); *see also United States v. Traylor,* 656 F.2d 1326, 1333 n. 6 (9th Cir.1981); Fed.R.Evid. 103(a)(1); 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 103[02] (1985).

### IV.

Appellants contend that the district court erred when it admitted into evidence portions of the deposition testimony of Dr. Kenneth Smith, Johns-Manville's former medical director. The deposition was taken in 1976 in Pittsburgh, Pennsylvania, as part of the pretrial discovery proceedings in *DeRocco v. Forty-Eight Insulation, Inc.,* No. 7407–2880 (Ct. of Common Pleas Allegheny County, Pa. filed July Term 1974), an asbestosis case brought by several steel workers. Johns-Manville was one of the defendants in that case; Raymark was not. Dr. Smith, a physician, had been employed by Johns-Manville from 1944 to 1966, with the exception of one year. He started out as the medical director of its Canadian subsidiary and in 1952 became medical director of all of the Johns-Manville companies, a position he occupied until 1966 when he retired. Dr. Smith died in 1977, a year after his deposition was taken in *DeRocco.*

Dr. Smith testified that he was aware of the hazards associated with asbestos as early as 1944 and that he began warning Johns-Manville's officers of such hazards in the late 1940's. He had found that the risk of asbestos dust exposure was the same for insulation workers as it was for asbestos miners and plant workers. In 1952, he recommended that Johns-Manville place caution labels on its insulation products containing asbestos.

Dr. Smith's testimony was clearly pertinent to the third element of appellees' negligent failure to warn claims against Johns-Manville. The district court accordingly admitted Dr. Smith's testimony, over Johns-Manville's objection, with a cautionary instruction that the jury was to limit the testimony to appellees' claims against that defendant. Raymark voiced no objection to the admission of the testimony or the adequacy of the court's cautionary instruction; hence, it cannot now object. *See* Fed.R.Evid. 103(a)(1). Our review is therefore limited to the merits of Johns-Manville's objection.

Johns-Manville argues that Dr. Smith's deposition testimony was inadmissible for two independent reasons. First, it did not meet the standard set by Fed.R.Evid. 804(b)(1),[22] which governs the admissibility of testimony given in the course of a prior proceeding by a witness who has become unavailable. Second, assuming that the deposition testimony satisfied Rule 804(b)(1), the court should have excluded it under Fed.R.Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice. We reject Johns-Manville's argument.

Rule 804(b)(1) provides that deposition testimony of an unavailable witness, which Dr. Smith had become, given "in compliance with law in the course of another proceeding" is not excludable hearsay "if the party against whom the testimony is [being] offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Johns-Manville contends that Dr. Smith's deposition, which was taken by the *DeRocco* plaintiffs, should have been excluded as hearsay because the deposition was not taken in compliance with law and it either had no opportunity to develop Dr. Smith's testimony by cross-examination or, if it had one, it was not motivated to cross-examine Dr. Smith to the extent that it would have been had he appeared to testify in appellees' cases.

Our review of Johns-Manville's Rule 804(b)(1) argument is somewhat hindered because the record concerning the admission of Dr. Smith's deposition testimony is not complete. Rather, it is limited to the deposition itself and the trial judge's perfunctory statement, made at the pretrial conferences, denying Johns-Manville's *in limine* motion to exclude the testimony.[23] For example, there is no evidence in the record to support Johns-Manville's claim that the deposition was not taken "in compliance with law." The transcript of the deposition proceeding discloses no such infirmity; in fact, it does not even contain a challenge by Johns-Manville to that effect. On the contrary, it appears that the *DeRocco* plaintiffs deposed Dr. Smith in conformance with Pennsylvania law. Johns-Manville's first alleged Rule 804(b)(1) deficiency accordingly fails.

Johns-Manville's claim that it had no opportunity to cross-examine Dr. Smith requires no discussion; it is conclusively contradicted by the transcript of the deposition itself. Johns-Manville's alternative claim, that it was not motivated to cross-examine the witness as it would have been had it

---

**22.** Fed.R.Evid. 804(b)(1) states, in pertinent part:

> **Rule 804. Hearsay Exceptions; Declarant Unavailable**
>
> . . . .
>
> **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> **(1) Former testimony.** Testimony given as a witness ... in a deposition taken in compliance with law in the course of ... another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

**23.** Prior to trial, Johns-Manville moved the court in all of the pending asbestos cases to bar the plaintiffs from introducing Dr. Smith's deposition into evidence, asserting the same Fed.R. Evid. 804(b)(1) grounds now presented. The record before us does not include a definitive ruling by the district court on the motion. The record indicates that the court, in a pretrial hearing in several of the other cases, stated that the plaintiffs could use the deposition to prove their claims against Johns-Manville. During the pretrial conference in appellees' cases, the trial court stated that it had already ruled on the deposition's admissibility in the other cases and that it would adhere to that ruling.

known that appellees would seek to introduce his deposition in these cases, requires some discussion. Johns-Manville says that it lacked an equivalent motive for two reasons: first, the deposition was taken for discovery purposes only; second, the plaintiffs' claims in *DeRocco* differed from appellees' claims. The second reason is not persuasive because the *DeRocco* plaintiffs, like the claimants here, were asbestosis victims seeking compensation for exposure to asbestos dust.

■ Turning to the first reason, we note that, as a general rule, a party's decision to limit cross-examination in a discovery deposition is a strategic choice and does not preclude his adversary's use of the deposition at a subsequent proceeding. *See Wright Root Beer Co. v. Dr. Pepper Co.,* 414 F.2d 887, 890 (5th Cir.1969); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(b)(1)[02], at 804–75 (1985); *cf. Gill v. Westinghouse Electric Corp.,* 714 F.2d 1105, 1107 (11th Cir.1983) ("pretrial depositions are not only intended as a means of discovery, but also serve to preserve relevant testimony that might otherwise be unavailable for trial"). Johns-Manville has provided us with nothing to indicate that the Pennsylvania courts were not following this rule at the time Dr. Smith was deposed. We thus conclude that Johns-Manville's counsel took a calculated risk in limiting his cross-examination of the witness.

■ Johns-Manville's argument that Dr. Smith's testimony was inadmissible because its unfair prejudice and risk of confusion outweighed its probative value is also unpersuasive. The evidence was highly probative and indeed prejudicial, but it was not unfairly prejudicial and nothing about it was confusing or misleading.

## V.

Appellants contend that the trial court erred in instructing the jury that it could award the plaintiffs damages for future medical expenses because there was no evidence from which the jury could calculate such damages with reasonable certainty. The court's instruction was erroneous and, in our view, so misled the jury that it

constituted reversible error. *See Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516, 1525 (11th Cir.1985) (appellate court must look at "whether the charges, considered as a whole, sufficiently instruct the jury so that jurors understand the issues involved and are not misled").

The voluminous transcript of the sixteen-day trial in this case reflects only one piece of evidence concerning appellees' future medical expenses, a statement by Dr. Bashir Chaudry, a physician who examined the four appellees at the behest of the appellants. Dr. Chaudry was called as a defense witness. On cross-examination, he estimated that the cost of his examination, including x-rays, of each of the appellees was about $250. Dr. Chaudry, and the other physicians who testified, said that the appellees should receive future medical attention, but he, like the others, failed to indicate what the cost of such attention might be.

At the close of all the evidence, appellants moved the court to strike appellees' claims for future medical expenses, contending that the evidence was too speculative to allow an award for such expenses. The court's initial reaction was to grant their motion. When appellees' counsel pointed out that the testimony had established that their clients would need future medical attention, however, the court decided to submit the issue to the jury. With this ruling in hand, appellees' counsel, in their closing arguments, urged the jury to award damages for future medical expenses. Counsel suggested that Aubrey Hendrix's future medical expenses would amount to $4,250 and that Wainwright Hendrix's would be $4,750. Counsel arrived at these figures by multiplying $250, the estimated cost of Dr. Chaudry's pretrial examination, by seventeen and nineteen respectively, the Hendrixes' life expectancies in years. In an apparent oversight, counsel made no specific recommendation as to the amount the jury should award Tyres D. Watson and William H. DeLoach. Counsel did argue, however, that "the money award of each man has got to be enough so that each of them will

never have to worry again about ... how they are going to pay their bills" and provided the jury with a formula for determining their future medical expenses, which called for multiplying the appellee's life expectancy by $250. Because Watson had a life expectancy of twelve years and DeLoach was expected to live about twenty years, counsel in essence urged the jury to award them future medical expenses of $3,000 and $5,000, respectively.

■ Georgia law requires a claimant to prove with reasonable certainty not only that he will sustain future medical expenses, but also the amount of such expenses. *See Wayco Enterprises, Inc. v. Crews*, 155 Ga.App. 775, 272 S.E.2d 745, 747 (1980); *Jordan v. Ensley*, 149 Ga.App. 67, 253 S.E.2d 414, 416–17, *aff'd*, 244 Ga. 435, 260 S.E.2d 480 (1979). "Where a party sues for damages, he has the burden of proof of showing the amount of loss in a manner in which the jury ... can calculate the amount of the loss with a reasonable degree of certainty. An allowance for damages cannot be based on guess work." *Big Builder, Inc. v. Evans*, 126 Ga.App. 457, 191 S.E.2d 290, 291 (1972); *see Tendrift Realty Co. v. Hayes*, 140 Ga.App. 896, 232 S.E.2d 169, 169 (1977). It is error for a trial court to submit a claim for future medical expenses to the jury if, to make an award, the jury must engage in sheer speculation. *See Wayco Enterprises*, 155 Ga. App. 775, 272 S.E.2d at 747; *Hughes v. Brown*, 109 Ga.App. 578, 136 S.E.2d 403, 404 (1964).

■ In the cases at hand, the jury had no evidence upon which to base awards for future medical expenses. Counsel's recommendations were not evidence; nor did they represent permissible inferences from the evidence. No witness testified with any degree of certainty as to how often any of the appellees would have to see a physician in the future or the nature or extent of the treatment that might be required. Dr. Chaudry gave no indication that the cost of any such examination or treatment would be comparable to what he had charged for his initial examination. In short, no witness predicted appellees' future medical expenses with any degree of

certainty. Because appellees failed to carry the burden of proof on this issue, it should not have been presented to the jury. The court erred in submitting it, and the error was prejudicial.

Having concluded that the court's instruction on future medical expenses constituted prejudicial error, we must determine the appropriate remedy. Appellants argue that the remedy should be a new trial. They overlook the alternative remedy of a remittitur, which not only accomplishes justice but also promotes economy for the courts and the parties.

■ Appellate courts may order a remittitur when reversible error has occurred and the maximum effect upon the amount of the verdict due to the error can with reasonable accuracy be determined. The use of remittitur enables the court and the parties to avoid the delay and expense of a new trial, and ... furthers the legitimate objective of bringing litigation to as speedy and expeditious end as is reasonable.

6A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice ¶ 59.08[7], at 59–189 (2d ed. 1985) (footnote omitted).

■ The rule in this circuit is that, where there is no showing that the jury's determination of liability was the product of undue passion or prejudice, we can order a remittitur to the maximum award the evidence can support. *See Carlton v. H.C. Price Co.*, 640 F.2d 573, 582 n. 14 (5th Cir.1981); *Howell v. Marmpegaso Compania Naviera*, 536 F.2d 1032, 1034–35 (5th Cir.1976). Because our power to order a remittitur is the same as that of the trial court, *Carlton*, 640 F.2d at 582 n. 14, we may choose either "to determine the maximum award which the evidence could support and suggest a remittitur to that level, or to remand to the trial court for it to do so." *Howell*, 536 F.2d at 1034–35. Ordinarily, we will direct the district court on remand to order a remittitur or, at the option of the plaintiff, grant a new trial on the issue of damages. *Stewart & Stevenson Services, Inc. v. Pickard*, 749 F.2d 635, 650 n. 18 (11th Cir.1984); *see Wilson v. Taylor*, 733 F.2d 1539, 1550 (11th Cir.1984).

But when the error is obvious and the correction mechanical, we have avoided the unnecessary step of remanding the issue to the district court and have fixed the remittitur ourselves. *See Ferrero v. United States,* 603 F.2d 510, 515 (5th Cir.1979).

In the interest of justice and judicial economy, we order a remittitur of appellees' verdicts. We take this action because the amounts of the remittiturs are small and fairly ascertainable, the cost of a new trial on the issue of damages would be prohibitive under the circumstances, and remittiturs will eliminate all possible prejudicial effects of the erroneous jury instruction. The appellees' counsel, in their closing arguments to the jury, provided us with the formula for calculating the highest amounts the jury could have awarded appellees for future medical expenses. Subtracting these amounts from the jury's verdicts, we can arrive at damages awards unaffected by the erroneous jury instruction. Accordingly, we remit the respective jury verdicts as follows:

Aubrey Hendrix:
| | |
|---|---|
| jury verdict: | $105,000 |
| future medical expenses: | – 4,250 |
| corrected verdict: | $100,750 |

Wainwright Hendrix:
| | |
|---|---|
| jury verdict: | $60,000 |
| future medical expenses: | – 4,750 |
| corrected verdict: | $55,250 |

Tyres D. Watson:
| | |
|---|---|
| jury verdict: | $85,000 |
| future medical expenses: | – 3,000 |
| corrected verdict: | $82,000 |

William H. DeLoach:
| | |
|---|---|
| jury verdict: | $100,000 |
| future medical expenses: | – 5,000 |
| corrected verdict: | $ 95,000 |

## VI.

Prior to the trial of this case, appellees and their wives settled their claims against the numerous other co-defendants, receiving compensation in return for covenants not to sue. The settlement agreements allocated sixty percent of the compensation to the appellees, in satisfaction of their personal injury claims, and forty percent to their wives, in satisfaction of their loss of consortium claims. After the court entered the final judgments now before us, appellants moved the court to amend the judgments to set-off the amounts the appellees *and* their wives received under these settlements. *See* Fed.R.Civ.P. 59(e). Appellees conceded that set-offs were appropriate, but argued that the amounts paid to their wives should not be included. Appellants urged the court to include the sums paid to the wives because there was no evidence in the record from which the court could determine the portion of the settlements properly allocable to the loss of consortium claims.

In an effort to obtain such evidence, the court had appellants take the depositions of appellees, their wives, and their attorneys. The testimony disclosed adequate factual bases for the wives' claims and the trial court accepted the settlement allocations as reasonable. The jury verdicts were therefore reduced by sixty percent of the total settlement amount, which had been allocated to the appellees. Appellants contend that the district court's acceptance of the settlement allocations was both "arbitrary" and precluded by the applicable case law.[24] We disagree.

Under Georgia law, which provided the rule of decision in these cases, an injured person may obtain only one recovery of damages for his injuries. *Ford Motor Co. v. Lee,* 237 Ga. 554, 229 S.E.2d 379, 381 (1976); *Gilmore v. Fulton-DeKalb Hospital Authority,* 132 Ga.App. 879, 209 S.E.2d 676, 678 (1974). It follows then

> that when one of two joint tortfeasors settles with a plaintiff and takes a covenant not to sue, the remaining tortfeasor, or defendant, is entitled to have credited against any damages that the jury might find against it the payment made by the other for the covenant not to sue, up to the full amount, thereof.

*Malone v. City of Rossville,* 107 Ga.App. 271, 129 S.E.2d 563, 564 (1963); see *American Chain & Cable Co. v. Brunson,* 157

---

**24.** Appellants do not allege that the settlement agreement and allocations were fraudulent or collusive.

Ga.App. 833, 278 S.E.2d 719, 723 (1981). A loss of consortium claim, although derivative, is a separate and distinct cause of action; the damages sustained by a spouse are exclusive of those suffered by her husband. *See Smith v. Tri-State Culvert Manufacturing Co.*, 126 Ga.App. 508, 191 S.E.2d 92, 94 (1972); *Hightower v. Landrum*, 109 Ga.App. 510, 136 S.E.2d 425, 428–29 (1964). Thus, a plaintiff's judgment should not be set-off by the amount his or her spouse received in settlement of a loss of consortium claim. Given this principle of law, the district court properly rejected the demand to reduce appellees' judgments by the amounts their wives received in settlement. In addition, we cannot say that the district court's finding that the settlement allocation was reasonable was clearly erroneous.

## VII.

Appellants have presented several additional claims of error. None requires discussion as all are devoid of merit. We find no reversible error in this record save the jury instruction regarding future medical expenses. To cure that error, we order remittiturs which the district court, on receipt of our mandate, shall implement by amending appellees' judgments as directed.

AFFIRMED in part; REVERSED in part and REMANDED with instructions.