Filed 10/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RAUL BERROTERAN II,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF<br>LOS ANGELES COUNTY,<br><br>        Respondent;<br><br>FORD MOTOR COMPANY,<br><br>        Real Party in Interest. | B296639<br><br>(Los Angeles County<br>Super. Ct. No. BC542525)<br><br>OPINION AND ORDER<br>GRANTING PETITION<br>FOR WRIT OF MANDATE |

ORIGINAL PROCEEDING; petition for writ of mandate. Gregory Keosian, Judge. Petition granted.

Knight Law Group, Steve B. Mikhov, Lauren A. Ungs; The Altman Law Group, Bryan C. Altman, Christopher J. Urner; Greines, Martin, Stein & Richland, Edward L. Xanders and Cynthia E. Tobisman for Petitioner.

Horvitz & Levy, Frederic D. Cohen, Lisa Perrochet, Allison W. Meredith; Sanders Roberts, Justin H. Sanders, Darth K. Vaughn, and Sabrina C. Narain for Real Party in Interest.

This case puts us in the unenviable position of disagreeing with our sister court as to the admissibility under Evidence Code section 1291, subdivision (a)(2)[1] of former testimony.

Here, the challenged former testimony is from nine unavailable witnesses, who previously were deposed in other state and federal litigation. The parties dispute whether real party in interest, Ford Motor Company (Ford), "had the right and opportunity to cross-examine the declarant *with an interest and motive similar to that which [it] has at the hearing*." (§ 1291, subd. (a)(2), italics added.) It is undisputed that petitioner Raul Berroteran II otherwise satisfied the statutory prerequisites for admission of the former testimony under section 1291.

We conclude Ford had the right and opportunity to cross-examine its employees and former employees with a similar motive and interest as it would have in the instant case. Each case, including the present one, concerns Ford's model 6.0-liter diesel engine, the engine's alleged deficiencies, Ford's alleged knowledge of those deficiencies, and Ford's strategy regarding repairing the engines. While a party's motive and interest to cross-examine may potentially differ when the prior questioning occurs in a pre-trial deposition, Ford failed to demonstrate any such different motive or interest here.

In reaching this conclusion, we disagree with *Wahlgren v. Coleco Industries, Inc.* (1984) 151 Cal.App.3d 543 (*Wahlgren*) to the extent it espouses a blanket proposition that a party has a different motive in examining a witness at a deposition than at trial. *Wahlgren* assumed that deposition testimony is limited to discovery and has a "limited purpose and utility." (*Id.* at p. 546.)

---

[1] Undesignated statutory citations to section 1291 refer to Evidence Code section 1291.

2

These assumptions, however, are unsupported by legal authority, inconsistent with modern trials and the omnipresence of videotaped depositions during trial, and contrary to persuasive federal law interpreting an analogous hearsay exception.

We grant Berroteran's petition for writ of mandate and direct the trial court to enter a new order denying Ford's motion in limine excluding the videotaped deposition testimony of nine of Ford's employees and former employees. We also direct the trial court to reconsider the admissibility of documentary evidence that the trial court may have excluded because it found the depositions inadmissible.

## BACKGROUND

This mandate proceeding challenges the trial court's grant of Ford's motion in limine to exclude the deposition testimony of the following Ford employees and former employees: Frank Ligon, Scott Eeley, John Koszewnik, Mike Frommann, Mark Freeland, Scott Clark, Eric Gillanders, Eric Kalis, and Robert (also referred to as Bob) Fascetti (motion in limine no. 30). Clark, Gillanders, and Kalis testified as Ford's persons most knowledgeable.

### 1.    Operative Complaint in the Current Litigation

Berroteran's initial complaint is not included in our record. On May 22, 2014, Berroteran filed the operative pleading, the first amended complaint, alleging causes of action for multiple counts of fraud, negligent misrepresentation, violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), and violation of the Song-Beverly Consumer Warranty Act (*id.*, § 1790 et seq.).

3

Berroteran alleged that on March 25, 2006, he purchased a new model Ford F-250 truck. The truck had a defective 6.0-liter diesel engine supplied by Navistar International Transportation Corporation (Navistar). When he purchased his Ford truck, Berroteran relied on Ford's representations that the engine was reliable and offered superior power. Prior to purchasing the vehicle, Berroteran read materials prepared by Ford stating that the engine was "high-quality" and "free from inherent defects," and was " 'best-in-class: horsepower, gas torque, unsurpassed diesel horsepower, best conventional towing, and best 5th wheel towing.' " Further, a salesperson assured Berroteran the engine was Ford's best.

Berroteran also alleged that while driving his truck, he experienced numerous breakdowns, "a blown turbo," and problems while towing. According to Berroteran, Ford's attempts at repairs did not remedy the problems despite Ford's representations that it had fixed the engine. Berroteran further alleged he was unable to use the truck for the purposes for which he purchased it.

In the operative complaint, Berroteran described Ford's purported deceptive repair history regarding his and other consumers' 6.0-liter Navistar diesel engines: "Ford: (a) rather than identifying and eliminating the root cause of these defects, produced and sold the vehicle to Plaintiff[ ] and other consumers, knowing it contained a defective engine; (b) adopted through its dealers a 'Band-Aid' strategy of offering minor, limited repair measures to customers who sought to have the defects remedied, a strategy that reduced Ford's warranty expenditures but did not resolve the underlying defects and, in fact, helped to conceal the defects until the applicable warranties expired; and (c)

4

intentionally and fraudulently concealed from Plaintiff . . . these inherent defects prior to the sale or any time thereafter. . . ." In Berroteran's words:  "At all relevant times, Ford was aware of its inability to repair the defects in the 6.0-liter Navistar diesel engine."

## 2.    Other Litigation Against Ford Related to the 6.0-Liter Diesel Engine

Like the current case, the prior litigations in which plaintiffs deposed Ford's employees and former employees involved allegations that Ford's 6.0-liter diesel engine was defective.  We summarize below those prior litigations and the videotaped depositions that are at issue in the mandate proceeding before us.

### a.    *MDL No. 2223 In re:  Navistar 6.0L Diesel Engine Products Liability Litigation Federal Multidistrict Litigation[2]*

Berroteran was a putative class member of the federal lawsuit *Burns v. Navistar Inc. and Ford Motor Company* filed in the Southern District of California.  The case merged into a multidistrict class action against Ford related to the 6.0-liter diesel engine.

Ford accurately characterizes the operative complaint in the multidistrict litigation as alleging "there were defects in the 6.0-liter diesel engine that Ford installed in a range of pickup trucks, sports utility vehicles, vans, and ambulances between 2003 and 2007."  Ford accurately states that like in the current

---

[2] *In re: Navistar 6.0L Diesel Engine Products Liability Litigation (In re: Navistar)* [MDL No. 2223].

5

proceeding, the multidistrict litigation "deal[t] generally with alleged 6.0-liter engine problems." The operative complaint in the multidistrict litigation included a subclass of persons who purchased or leased vehicles in the state of California. That subclass alleged violations of California's Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.) and California's Unfair Competition Law (Bus. & Prof. Code, § 17200).

The 113-page operative complaint included the following allegations.[3] Ford marketed and sold vehicles equipped with Ford's 6.0-liter diesel engine. The 6.0-liter diesel engine was defectively designed and manufactured. "Ford knew from the outset that there were severe and pervasive design, manufacturing, and quality issues plaguing the Ford 6.0L Engines. Yet, despite this knowledge, Ford never disclosed any of these issues to consumers." Ford failed to authorize necessary major engine repairs during the warranty period, instead authorizing only inadequate repairs. Plaintiffs sought damages related to the cost to repair or replace the 6.0-liter diesel engine, and to the diminution in value as a result of the alleged defective engine.

The multidistrict litigation ultimately settled after Ford stipulated to class certification and agreed to the settlement. Berroteran opted out of the class action settlement. The deposition testimony Berroteran seeks to introduce was admitted

---

[3] We grant Berroteran's request for judicial notice of Ford's answer to the operative complaint in the multidistrict litigation. The answer is relevant because it describes allegations in the federal complaint that were redacted from that complaint. The answer, filed in federal court, is subject to judicial notice. (Evid. Code, § 452, subd. (d).)

in four lawsuits by other putative plaintiffs who also had opted out of the settlement in the multidistrict litigation.

In the context of the multidistrict litigation, the following Ford employees and former employees were deposed:  Frank Ligon, Scott Eeley, John Koszewnik, Mike Frommann, and Mark Freeland.  Ligon, Freeland, and Koszewnik had retired from Ford before their depositions.  Ford's counsel represented each deponent during the depositions.

At the time of his videotaped deposition, Eeley was employed at Ford as a supervisor for computer-aided engineering.  In his deposition, Eeley testified regarding the 6.0-liter diesel engine, as well as Ford's position with respect to warranty issues involving the engine.

In a videotaped deposition, Koszewnik testified that he left his employment with Ford in 2006, after 29 years.  Koszewnik had many positions at Ford and retired as a chief engineer for three gasoline engines.  The deposition concerned the "6.0-liter engine that Ford made."  In a videotaped deposition, Frommann testified that in 2006, he worked at Ford's customer service division as a warranty program manager.  Plaintiffs' attorneys questioned Frommann about his knowledge of defects in Ford's 6.0-liter diesel engine.

At the time of his videotaped deposition, Ligon had retired from Ford as the director of service engineering operations.  In preparation for his deposition, Ligon reviewed e-mails about the 6.0-liter diesel engine and met with Ford's counsel.  Ligon testified about the 6.0-liter diesel engine and testified about e-mails related to the engine.  Freeland also had retired before his videotaped deposition.  Freeland had several positions at Ford, and prior to his retirement, worked in "engine research."

In his deposition, Freeland testified he understood his deposition concerned "the work [he] did in conjunction with [a] . . . failure analysis on injectors on the 6.0 diesel engine."

### b. *Brown, et al. v. Ford Motor Company (Superior Court of California; County of Butte)*[4]

The operative complaint in *Brown* named Ford as a defendant and asserted the same causes of action as alleged in the current case. *Brown* arose out of the plaintiffs' purchase of a Ford truck with a 6.0-liter diesel engine supplied by Navistar. As in this case, the plaintiffs alleged that the 6.0-liter engine was defective. Further, as in this case, the plaintiffs described Ford's repair strategy for the 6.0-liter diesel engine: "Ford: (a) rather than identifying and eliminating the root cause of these defects, produced and sold the vehicle to Plaintiffs and other consumers, knowing it contained a defective engine; (b) adopted through its dealers a 'Band-Aid' strategy of offering minor, limited repair measures to customers who sought to have the defects remedied, a strategy that reduced Ford's warranty expenditures but did not resolve the underlying defects and, in fact, helped to conceal the defects until the applicable warranties expired; and (c) intentionally and fraudulently concealed from Plaintiffs . . . these inherent defects prior to the sale or any time thereafter. . . ."

Eric Kalis's videotaped deposition was taken in the *Brown* litigation. At that deposition, Kalis testified as Ford's person most knowledgeable on the repair rates for the 6.0-liter diesel engine and Ford's analysis of the root causes of the engine's problems. Kalis also testified as Ford's custodian of records.

---

[4] *Brown, et al. v. Ford Motor Company* (Super. Ct. Butte County, No. 160060).

8

Kalis was an employee of Ford at the time of his deposition in Ford's automotive safety office's design analysis group. Kalis confirmed that numerous documents were true and correct copies of documents created in the ordinary course of business. Counsel for Ford stipulated that for purposes of the *Brown* litigation, the videotaped deposition could be used "for any purpose whatsoever . . . ."[5]

### c. *Preston, et al. v. Ford Motor Company (Superior Court of California, County of El Dorado)*[6]

The operative complaint in *Preston* alleges the same causes of action against Ford as in the current litigation. This lawsuit also involved allegations of a defective 6.0-liter diesel engine supplied by Navistar. As in *Brown* and in the current litigation, the Prestons alleged: "Ford: (a) rather than identifying and eliminating the root cause of these defects, produced and sold the vehicle to Plaintiffs and other consumers, knowing it contained a defective engine; (b) adopted through its dealers a Band-Aid strategy of offering minor, limited repair measures to customers who sought to have the defects remedied, a strategy that reduced Ford's warranty expenditures but did not resolve the underlying defects and, in fact, helped to conceal the defects until the

---

[5] Kalis's deposition also was taken in *Dokken v. Ford Motor Company*, a case filed in Superior Court in Sutter County. It is undisputed that *Dokken* involves the same claims as the current litigation. (*Dokken v. Ford Motor Co.* (Super. Ct. Sutter County, No. CVCS13-0001994).)

[6] *Preston, et al. v. Ford Motor Company* (Super. Ct. El Dorado County, No. SC20130071).

applicable warranties expired; and (c) intentionally and fraudulently concealed from Plaintiffs . . . these inherent defects prior to the sale or any time thereafter. . . ."

In connection with *Preston*, Eric Gillanders testified in a videotaped deposition as Ford's designated person most knowledgeable regarding Ford's policies and procedures for the reduction of warranty claim buybacks under California law from 2003 onward. Gillanders was Ford's global business process manager and former dealer operations manager. Gillanders also testified as a custodian of records. At the end of the deposition, one of Ford's attorney's questioned Gillanders. Among other things, Gillanders testified that his "testimony" regarding the categories on which he was the person most qualified would "be the same in any Ford lemon law case pending in California."

Scott Clark testified in a videotaped deposition regarding Ford's policies and procedures for warranty claim buybacks. Clark testified as Ford's designated person most knowledgeable regarding Ford's policies, standards and training from 2003 onward regarding California Lemon Law claims and California consumer complaints to the Better Business Bureau. Counsel for Ford requested that Ford produce Clark only once for all matters pending in the state of California concerning the 6.0-liter engine for which plaintiff's counsel was counsel of record. Clark had "oversight over the dispute resolution program, the consumer affairs team, and the California Lemon Law team," as well as a warranty assistance team. He understood that his deposition concerned matters related to California's lemon law and Ford's procedure in handling lemon law claims. At the end of the deposition, Ford's counsel asked Clark questions.

10

### d. *Williams A. Ambulance Inc., et al. v. Ford Motor Company (Federal District Court for the Eastern District of Texas)*[7]

Bob Fascetti's videotaped deposition was taken in federal litigation in Texas. The operative complaint is not included in the record, but it is not disputed that the litigation involved Ford's 6.0-liter diesel engine. The parties dispute whether the complaint identified a specific cause of action for fraud.

In July 2008, at the time of his videotaped deposition, Fascetti was the director of gas and diesel engineering for Ford. Fascetti provided an affidavit on Ford's behalf in Ford's lawsuit against Navistar, the supplier of the 6.0-liter diesel engine. Fascetti testified in his deposition about the 6.0-liter diesel engine. He acknowledged that the repair rates were "very high." It had the highest repair rate "ever experienced by Ford for an engine in widespread production."

### 3. In the Current Litigation, Ford Files Motion in Limine Number 30 to Exclude Prior Testimony of Ford's Witnesses From the Other Litigation

In the trial court, Ford sought to exclude the videotaped depositions of Scott Clark, Bob Fascetti, Scott Eeley, Mark Freeland, Eric Gillanders, Mike Frommann, Eric Kalis, Frank Ligon, and John Koszewnik. Ford argued that the deposition testimony constituted hearsay, and no exception to the hearsay rule applied to allow admission of the deposition testimony.

---

[7] *Williams A. Ambulance, Inc., et al. v. Ford Motor Company* (E.D. Tx., No. 1:06-CV-00776).

11

With respect to section 1291, Ford argued: "Ford clearly did not have a similar interest and motive to examine its employees at those depositions as it will have at trial in this case. Indeed, it is not established that Ford's counsel undertook any re-direct examination at the depositions. As a result, the deposition testimony of the Ford employees in the former cases is not admissible under [section] 1291[, subdivision] (a)(2), and the jury should not hear this testimony." Beyond these conclusory assertions, Ford offered no analysis, explanation, or support for its statements. Instead, Ford relied on *Wahlgren* in support of its motion in limine.

### 4. Opposition to Motion in Limine No. 30

Berroteran opposed the motion in limine no. 30. Berroteran argued that Ford "does not even describe the witnesses or testimony it seeks to exclude. . . ." (Underlining omitted.) According to Berroteran: "The deposition testimony . . . has been admitted in four jury trials in the past year, and has been submitted to countless Courts in connection with summary judgment motions, pretrial motions, discovery motions. . . ." "It is highly relevant, as it directly concerns the subject matter of this case. Ford and its army of lawyers had unlimited opportunities to prepare those 'Ford company witnesses' in advance of their testimony, had every opportunity to examine those witnesses during the depositions, and had the same or similar motive as Ford has in this case."

### 5. Motion in Limine No. 29 and Opposition

In its motion in limine no. 29, Ford sought to exclude several of Berroteran's trial exhibits that had been produced in the multidistrict litigation. Ford argued among other things:

12

"Without any sponsoring witnesses or context from individuals with personal knowledge of the events discussed in the documents, these documents are mere props in Plaintiffs' attorneys' conspiracy theory spectacle."

Berroteran opposed the motion, arguing among other things: "In arguing that the documents are hearsay, Ford ignores the fact that its own custodian of records Eric Kalis testified that they were Ford business records for purposes of California's hearsay exception. . . ."

## 6. Hearing on the Motions in Limine

At the hearing on Ford's motions in limine, counsel for Ford relied principally on *Wahlgren* to argue that Ford did not have a motive to cross-examine its own witnesses: "We need—not only an opportunity but a motive to cross-examine. The law—with the leading case being *Wahlgren*—is that you don't have that in discovery . . . nor would that make sense in a class action where the issues were limited to class issues over a span of model years in an uncertified class. It makes no sense." "How could we . . . possibly [have] had a motive to cross-examine in a class action involving different model years where the discovery was limited to class issues and not merits issues?" Counsel (incorrectly) argued that the deposition testimony was limited to certification issues such as commonality and typicality, "not merits issues."

Counsel for Berroteran's counter argument focused on the identity of the issues regarding the 6.0-liter engine in the current and former litigations and Ford's correlating motive to defend its witnesses because Ford knew the videotaped depositions could be used in other cases involving the same engine: "It is no surprise to Ford that the plaintiffs in the class action intended to

13

use these depositions in trials.  First of all, that's the purpose of the discovery.  They are not just exploring the claims. . . . So for 1291, Ford had a motive, the same motive that they have here.  They're defending themselves in consumer actions revolving around the 6.0[-]liter engine.  They had the opportunity.  They had attorneys present."

The depositions convey "what Ford knew and when they knew it about problems with the 6.0[-]liter engine.  So it is the same allegation.  Here we're saying Ford had knowledge of these problems prior to the date of sale of this truck.  That's what they alleged in the class action."  Berroteran's counsel argued that Ford had the "same motivation . . . They want truthful testimony from their employees.  [¶]  If the employee said, we had the highest warranty rates and that wasn't true, certainly Ford would have a motivation to correct that testimony on the record, just like they would here."[8]

---

[8]  Berroteran's counsel also argued that the depositions taken in the multidistrict litigation were admissible under Code of Civil Procedure section 2025.620, subdivision (g), which provides in pertinent part:  "When an action has been brought in any court of the United States or of any state, and another action involving the same subject matter is subsequently brought between the same parties . . . , all depositions lawfully taken and duly filed in the initial action may be used in the subsequent action as if originally taken in that subsequent action." (Code Civ. Proc., § 2025.620, subd. (g).)

Berroteran advances the same argument pursuant to Code of Civil Procedure, section 2025.620 on appeal and also argues that the testimony from the persons most qualified is admissible as a party admission under Evidence Code section 1222.  Because we conclude that the deposition testimony

14

### 7. Trial Court Findings

The trial court ruled in Ford's favor. The court's brief explanation was as follows: "My ruling would be to grant the motion in limine [no. 30] and exclude those deposition transcripts for the reasons argued. In terms of whether or not they are actual parties—and specifically on just the broadness of the other cases and lawsuits and specifics of our particular case and whether or not those cases address the specifics of our particular case—I just don't think they [do]. . . ." "[T]hey involve multiple issues that are not really at issue here." The court later stated, "I guess it comes down to whether or not the testimony—and this is trial testimony or deposition testimony?"

The trial court granted motion in limine no. 30, "excluding the videotape testimony." The court also granted motion in limine no. 29, excluding numerous exhibits referenced in the deposition testimony. The court stated that without the deposition testimony, no one would testify that the documents constituted Ford's business records.[9]

This court issued an alternative writ requiring the trial court either to vacate its ruling granting motion in limine no. 30 or in the alternative, to show cause why a peremptory writ of mandate ordering the trial court to vacate its ruling should not issue. The trial court indicated that it would not vacate its ruling.

---

was admissible under section 1291, we need not address Berroteran's additional arguments.

[9] The trial court additionally stated that the exhibits constituted hearsay and could not be characterized as admissions.

15

## STANDARD OF REVIEW

The Evidence Code defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it falls within an exception, such as the one provided in section 1291. (Evid. Code, § 1200, subd. (b).)

"[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation] and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto . . . .' [Citation.] We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citation] . . . ." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

## DISCUSSION

We begin with legal background necessary to assess the parties' arguments. We then explain why the trial court abused its discretion in excluding former deposition testimony of Ford's witnesses taken in federal and state litigation regarding Ford's 6.0-liter diesel engine, the same engine underlying Berroteran's lawsuit.

As set forth below, although *Wahlgren* arguably supported Ford's argument and the trial court's conclusion, we disagree with *Wahlgren*'s categorical bar to admitting deposition testimony under section 1291 based on the unexamined premise that a party's motive to examine its witnesses at deposition always differs from its motive to do so at trial. Our conclusion

16

that no such categorical bar exists is consistent with federal authority interpreting a similar provision in the Federal Rules of Evidence.

## A. Both section 1291 and rule 804 of the Federal Rules of Evidence include a hearsay exception for former testimony.

California and federal exceptions to the hearsay rule for former testimony are similar. Section 1291, subdivision (a)(2) provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and *opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing*." (§ 1291, subd. (a)(2), italics added.)

Under federal law, testimony that "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and [¶] is now offered against a party who had . . . *an opportunity and similar motive to develop it by direct, cross, or redirect examination*" is admissible as an exception to the hearsay rule. (Fed. Rules Evid., rule 804(b)(1), 28 U.S.C. (rule 804), italics added.) Rule 804 balances the risk of introducing out-of-court testimony against the risk of excluding critical evidence. (*Lloyd v. American Export Lines, Inc.* (1978) 580 F.2d 1179, 1185.)

Whereas section 1291 requires a "motive similar," rule 804 requires a "similar motive" to examine the witness as a prerequisite to admission of former testimony. Because rule 804 contains a similarly worded exception to the hearsay rule, federal

17

authority is instructive in interpreting and applying section 1291. (See *In re Joyner* (1989) 48 Cal.3d 487, 492; see also *People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 563 ["if the 'objectives and relevant wording' of a federal statute are similar to a state law, California courts 'often look to federal decisions' for assistance in interpreting this state's legislation"].) As our high court has explained: "In resolving questions of statutory construction, the decisions of other jurisdictions interpreting similarly worded statutes, although not controlling, can provide insight." (*In re Joyner*, at p. 492.)

Ford relies on *Smith v. Bayer Corp.* (2011) 564 U.S. 299 for the proposition that even if federal and state " 'procedural' " statutes are identically worded, a state and a federal court can interpret their respective statutes differently. (*Id.* at pp. 309–310.) The issue before the United States Supreme Court in *Smith* was whether the relitigation exception to the federal Anti-Injunction Act precluded a federal court's enjoining a West Virginia state court from considering a class certification motion after a federal court had denied class certification involving a different class representative. (*Id.* at p. 302.) It was in the course of deciding this issue that the United States Supreme Court observed West Virginia's high court had stated its "independence" from the federal court's interpretation of the Federal Rules of Civil Procedure, rule 23(b)(3), 28 U.S.C.A. governing class certification. We fail to discern the relevance of *Smith* to whether section 1291, subdivision (a)(2) and rule 804 should be read in pari materia.

**B.    Federal cases interpreting rule 804 require factual analysis comparing the motive in the former case to that of the current case.  Similar, not identical motive, is required.**

Federal cases considering rule 804's critical language—"similar motive"—require an analysis comparing the existing case with the one involving the former testimony.  Existence of a similar motive depends on the similarity of the underlying issues and the context of the questioning.  (*U.S. v. Salerno* (1992) 505 U.S. 317, 326 (conc. opn. of Blackmun, J.).)  Whether the "questioner had a similar motive at both proceedings to show that the fact had been established (or disproved)" is relevant to assessing admissibility under rule 804.  (*U.S. v. DiNapoli* (2d Cir. 1993) 8 F.3d 909, 912.)

Under rule 804, former deposition testimony is not categorically excluded based on an assumption that a motive to examine a witness differs during deposition and at trial.  "[P]retrial depositions are not only intended as a means of discovery, but also serve to preserve relevant testimony that might otherwise be unavailable for trial."  (*Gill v. Westinghouse Elec. Corp.* (11th Cir. 1983) 714 F.2d 1105, 1107.)  The relevant issue is not whether the party had a "tactical or strategic incentive" to question its witnesses.  Instead the relevant question is whether the party had "an opportunity and similar motive to develop the testimony."  (*U.S. v. Mann* (5th Cir. 1998) 161 F.3d 840, 861; *DeLuryea v. Winthrop Laboratories, Etc.* (8th Cir. 1983) 697 F.2d 222, 227 (*DeLuryea*) ["Opportunity and motivation to cross-examine are the important factors, not the actual extent of cross-examination]; *Murray v. Toyota Motor Distributors, Inc.* (9th Cir. 1982) 664 F.2d 1377, 1379.)  "[A]s a

19

general rule, a party's decision to limit cross-examination in a discovery deposition is a strategic choice and does not preclude his adversary's use of the deposition at a subsequent proceeding." (*Hendrix v. Raybestos-Manhattan, Inc.* (11th Cir. 1985) 776 F.2d 1492, 1506 (*Hendrix*); see also *Pearl v. Keystone Consol. Industries, Inc.* (1989) 884 F.2d 1047, 1052 [party who makes the decision not to cross-examine witness in deposition cannot complain that the failure to cross-examine renders the deposition inadmissible].)

*Hendrix* involved allegations from consolidated asbestos cases that the defendants failed to warn plaintiffs to avoid inhaling asbestos dust in the handling of insulation products. (*Hendrix*, *supra*, 776 F.2d at p. 1492.) On appeal, defendants argued that it was error to admit portions of Dr. Kenneth Smith's deposition testimony concerning his knowledge about the hazards of asbestos dust and his efforts to warn the officers of one of the defendants about those hazards. (*Id.* at p. 1504.) Smith, the former medical director of one defendant, had testified in deposition in a different case involving asbestos related injuries. (*Ibid.*)

Applying rule 804, the appellate court rejected the argument that the defendant, who previously employed Smith, did not have the same motive to examine its witness in a deposition as at trial. (*Hendrix*, *supra*, 776 F.2d at p. 1506.) It explained that pretrial depositions not only serve as discovery, but also preserve testimony that might be unavailable at trial. (*Ibid.*) Further, the plaintiffs in both cases were asbestosis victims seeking compensation for exposure to asbestos dust. (*Ibid.*)

20

*DeLuryea* applied rule 804 to hold that the former testimony in a deposition in a worker's compensation action was admissible in a products liability trial involving a pain killer that allegedly caused serious tissue damage at the injection site. The former testimony there was of plaintiff's psychiatrist, who testified in plaintiff's workers' compensation case that plaintiff was abusing the painkiller, and that he "took her off" the painkiller but feared she would not be "able to stay away" from the drug. (*DeLuryea*, *supra*, 697 F.2d at p. 226.) The appellate court held that the deposition testimony was admissible because the deponent's testimony concerned matters relevant to both actions, to wit, whether plaintiff's " 'misconduct' " caused her injuries, and that plaintiff had "a similar motive in the two actions in disproving the allegations of misconduct." (*Ibid*.) It followed that the plaintiff "had a similar motive for testing the credibility of the testimony on cross-examination." (*Id*. at pp. 226–227.)

## C.   Except for *Wahlgren*, California law is consistent with federal law.

Section 1291 provides " 'no magic test to determine similarity in interest and motive to cross-examine a declarant. Factors to be considered are matters such as the similarity of the party's position in the two cases, the purpose sought to be accomplished in the cross-examination, and whether under the circumstances a thorough cross-examination of declarant by the party would have been reasonably expected in the former proceeding.' " (*People v. Ogen* (1985) 168 Cal.App.3d 611, 617 [analyzing the admissibility of preliminary hearing testimony from a different proceeding]; *People v. Samayoa* (1997) 15 Cal.4th 795, 850 [comparing motive to cross-examine witness at the

21

preliminary hearing and during penalty phase of trial]; cf. *People v. Sanders* (1995) 11 Cal.4th 475, 525 [the People lacked a similar purpose in cross-examining witness at a suppression hearing as opposed to at trial].)

A party's "interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars. [Citation.] The ' "motives need not be identical, only 'similar.' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 333.) Where the party had the same motive to discredit the witness and challenge the witness's credibility, the former testimony would be admissible under section 1291. (*People v. Harris*, at p. 333.) Whether evidence is admissible under section 1291, moreover, depends on whether the party against whom the former testimony is offered had a motive and opportunity for cross-examination, not whether counsel actually cross-examined the witness. (*People v. Williams* (2008) 43 Cal.4th 584, 626–627.)

In contrast to these cases, *Wahlgren* appears categorically to exclude deposition testimony from the section 1291 hearsay exception. In *Wahlgren*, the plaintiff filed a personal injury action against defendants. (*Wahlgren*, *supra*, 151 Cal.App.3d at p. 545.) The plaintiff suffered an injury after diving from a slide into a swimming pool. (*Ibid.*) Plaintiff was unsuccessful at trial, and on appeal, argued that the trial court erred in excluding former deposition testimony of one of defendant's officers. (*Ibid.*) The testimony concerned the policy of placing labels on pools to alert users to the dangers of diving. (*Ibid.*)

Affirming the trial court's decision to exclude the evidence, in a sparse opinion, the appellate court held the evidence was inadmissible under section 1291, subdivision (a)(2) because the defendant did not have the opportunity to cross-examine the declarant with the interest and motive similar to the current case. (*Wahlgren*, *supra*, 151 Cal.App.3d at p. 546.) As relevant here, *Wahlgren* states: "[I]t should be noted that a deposition hearing normally functions as a discovery device. All respected authorities, in fact, agree that given the hearing's limited purpose and utility, examination of one's own client is to be avoided. At best, such examination may clarify issues which could later be clarified without prejudice. At worst, it may unnecessarily reveal a weakness in a case or prematurely disclose a defense." (*Id*. at pp. 546–547.)

*Wahlgren*—a 1984 case—cites no support for its assertions that a deposition functions only as a discovery device. That assumption is at best outdated given the prevalence of videotaped deposition testimony in modern trial practice. *Wahlgren* cites no authority for the proposition that examination of one's "client is to be avoided." (*Wahlgren*, *supra*, 151 Cal.App.3d at pp. 546–547.) That blanket assumption appears inconsistent with the reality of often overlapping lawsuits in different jurisdictions and the prospect that an important witness could retire or otherwise become unavailable. *Wahlgren*'s analysis also conflicts with the plain language of section 1291, subdivision (a)(2), which, on its face is unqualified: The statute states that it applies to "[t]he former testimony" and is not limited to former "trial testimony." (§ 1291, subd. (a)(2).)[10]

---

[10] Ford relies on a comment regarding section 1291 from the Assembly Committee on the Judiciary in the publisher's

**D.    The trial court abused its discretion in granting motion in limine no. 30.**

In its motion in limine, Ford argued that it "clearly did not have a similar interest and motive to examine its employees at those depositions as it will have at trial in this case.  Indeed, it is not established that Ford's counsel undertook any re-direct examination at the depositions."  Ford offered no further explanation why its motive to examine any specific employee or former employee differed from its motive in the current case.  Ford offered no analysis of the causes of action in the prior litigation generating the challenged depositions and did not argue that those causes of action were different from the current litigation.  In essence, Ford's argument was that a party never has the same motivation to examine its own witnesses in a deposition as it has at trial, an argument (as demonstrated above) that is contrary to the weight of authority and modern litigation practice.

---

editor's note that where "the deposition was taken for discovery purposes" and the party did not cross-examine its own witness to "avoid a premature revelation of the weakness in the testimony of the witness or in the adverse party's case. . . . the party's interest and motive for cross-examination on the previous occasion would have been substantially different from his present interest and motive."  (Assem. Com. on Judiciary com., 29B pt. 5 West's Ann. Evid. Code (2015 ed.) foll. § 1291, pp. 86–87.)  Ford, however, did not proffer any evidence that there was any strategic reason for not cross-examining its witnesses at their depositions here.  Absent such a record, we do not address whether this partial legislative history would dictate a different outcome upon a proper and different record.

24

As Berroteran argues, Ford made no showing that it lacked a similar motive to examine its witnesses during their depositions, and the record demonstrates just the opposite. Ford had a similar motive to examine each of the nine deponents.[11] The videotaped deposition testimony from the former federal and state litigations was on the same issues Berroteran raises in his current lawsuit—whether the 6.0-liter engine was defective, Ford's knowledge of the alleged defect, and Ford's repair strategy. The deponents' testimony concerned matters relevant to the former and current actions. Ford had a similar motive to disprove the allegations of misconduct, and knowledge, all of which centered around the 6.0-liter diesel engine.

Gillanders' testimony exemplifies the similarity of the issues in this litigation and the former litigation. During his deposition, Gillanders testified that his testimony regarding the categories on which he was the person most qualified would "be the same in any Ford lemon law case pending in California." Because his testimony would be the same, Ford's motive to cross-examine him would be similar, if not the same.

Ford's additional arguments are unpersuasive. For example, Ford argues: "Ford had little or no motive in suits that involved engines produced over a five-year period to question witnesses about the engine that Berroteran purchased in 2006." Ford's argument ignores Berroteran's key allegation that: "Without remedying the defects [identified in 2002], Ford continued to equip subsequent model years of the[ ] F-250 truck, including the 2006 model, with the 6.0-liter engine. Regardless of

---

[11] It is undisputed that "Ford had an unrestricted opportunity at these depositions [of the nine witnesses] to examine each witness."

tweaks made to the 6.0-liter engine by Ford during subsequent model years, these same defects to the engine persisted throughout Ford's production and sale of the trucks." Even if the multidistrict litigation spanned a greater time period, it included 2006, the year Berroteran purchased his vehicle, and included Berroteran as a putative plaintiff.

Ford also argues that it had no incentive to question its witnesses on "Berroteran's vehicle, his vehicle purchasing experience, or his vehicle repair experience—to question witnesses about the particular problems Berroteran claimed to have experienced with his 2006 truck." Taken to its logical conclusion, Ford's argument appears to assume an additional prerequisite to section 1291—the identity of the parties. Clearly, that assumption is inconsistent with the language in section 1291.

Ford fails to demonstrate that it lacked a similar motive to examine its witnesses in the former litigation. Each deponent was represented by Ford's counsel, and Ford had the same interest to disprove allegations related to the 6.0-liter diesel engine. (Compare *N.N.V. v. American Assn. of Blood Banks* (1999) 75 Cal.App.4th 1358, 1396 [no similar interest where no defendant present at deposition had an interest in establishing the facts relevant to the current litigation].) Although each case involved a different plaintiff or additional plaintiffs, the gravamen of each lawsuit was the same or similar. The undisputable fact that every owner will have a different purchase and repair history does not negate Ford's similar motive in questioning its witnesses on the substantial overlapping allegations, specifically regarding the 6.0-liter diesel engine. To recap, section 1291 requires a similar, not an identical, motive.

26

In short, the record does not support the conclusion that Ford did not have a similar motive to cross-examine its own witnesses in the prior litigation. Even if the causes of action in the current and prior cases are not identical, the crux of the litigation is the same in each case. In the trial court, Ford inaccurately characterized the depositions as involving only discovery and only "class issues" such as "commonality, whether there's typicality." As summarized above, in fact, the former testimony concerned Ford's 6.0-liter diesel engine, policies and procedures for warranty claims, and the authentication of documents from a custodian of records. It is undisputed that the depositions have been admitted at trial in multiple cases, and thus did not serve only discovery purposes. For all these reasons, the trial court abused its discretion in granting Ford's motion to exclude the entire depositions of Ligon, Freeland, Frommann, Eeley, Koszewnik, Clark, Fascetti, Gillanders, and Kalis.[12]

E. **In light of our conclusion that the deposition testimony is admissible, the trial court should reconsider whether the documents are admissible.**

It appears that the trial court may have excluded many of Berroteran's proposed trial exhibits based on its exclusion of the deposition testimony (motion in limine no. 29). In light of this court's conclusion that the trial court erred in excluding the entirety of the former testimony of Ford's witnesses, it should reconsider the admissibility of the documentary evidence it excluded in response to Ford's motion in limine no. 29.

---

[12] Our holding concerns the admissibility of the deposition testimony under section 1291. We express no opinion concerning whether the evidence is objectionable on other grounds.

27

## DISPOSITION

The petition for writ of mandate is granted. The trial court is directed to vacate its orders granting Ford's motion in limine no. 30 and issue a new order denying Ford's motion to bar Berroteran from presenting the deposition testimony of the nine Ford witnesses—Ligon, Freeland, Frommann, Eeley, Koszewnik, Clark, Fascetti, Gillanders, and Kalis. The trial court is directed to vacate its order granting Ford's motion in limine no. 29 concerning documentary evidence and to reconsider that order in light of our ruling vacating the trial court's order regarding motion in limine no. 30. Berroteran is entitled to his costs in this proceeding.

CERTIFIED FOR PUBLICATION.


BENDIX, J.


We concur:



CHANEY, Acting P. J.



WEINGART, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.